381 F.3d 316
 UNITED STATES of America, Plaintiff-Appellee,
v.
Mohamad Youssef HAMMOUD, a/k/a Ali Abousaleh, a/k/a Ali Albousaleh, Defendant-Appellant,
Center for Constitutional Rights; National Coalition to Protect Political Freedom; National Association of Criminal Defense Lawyers; National Lawyers Guild, Amici Supporting Appellant.
 No. 03-4253.
 United States Court of Appeals, Fourth Circuit.
 Argued: August 2, 2004.
 Decided: September 8, 2004.
 
 Appeal from the United States District Court for the Western District of North Carolina, Graham C. Mullen, Chief District Judge. COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Stanley Lewis Cohen, New York, NY; James P. McLoughlin, Jr., Moore & Van Allen, PLLC, Charlotte, North Carolina, for Appellant.
 Demetra Lambros, United States Department of Justice, Washington, D.C., for Appellee.
 James W. Haldin, Moore & Van Allen, PLLC, Charlotte, NC, for Appellant.
 Robert J. Conrad, Jr., United States Attorney, Gretchen C.F. Shappert, United States Attorney, D. Scott Broyles, Assistant United States Attorney, Charlotte, NC; John F. DePue, John Douglas Wilson, Martha Rubio, United States Department of Justice, Washington, D.C., for Appellee.
 David D. Cole, Georgetown University Law Center, Washington, D.C.; Nancy Chang, Shayana Kadidal, Center for Constitutional Rights, New York, NY; Lisa Kemler, National Association of Criminal Defense Lawyers, Alexandria, VA, for Amici Supporting Appellant.
 Before WILKINS, Chief Judge, and WIDENER, WILKINSON, NIEMEYER, WILLIAMS, MICHAEL, MOTZ, TRAXLER, KING, GREGORY, SHEDD, and DUNCAN, Circuit Judges.
 
 
 1
 Affirmed by published opinion. Chief Judge WILKINS wrote the opinion, in which Judges WILKINSON, NIEMEYER, WILLIAMS, TRAXLER, KING, SHEDD, and DUNCAN joined and in which Judge WIDENER joined as to all except Part VII.C.
 
 
 2
 Judge WILKINSON wrote a concurring opinion.
 
 
 3
 Judge SHEDD wrote a concurring opinion.
 
 
 4
 Judge WIDENER wrote a concurring and dissenting opinion.
 
 
 5
 Judge MOTZ wrote a dissenting opinion, in which Judges MICHAEL and GREGORY joined.
 
 
 6
 Judge GREGORY wrote a dissenting opinion.
 
 
 7
 WILLIAM W. WILKINS, Chief Judge.
 
 
 8
 Mohammed Hammoud appeals the sentence imposed following his convictions of numerous offenses, all of which are connected to his support of Hizballah, a designated foreign terrorist organization (FTO). Hammoud also challenges two of his 14 convictions. The appeal was argued before a three-judge panel, but prior to decision the court voted to hear the case en banc in order to consider the effect of Blakely v. Washington, ___ U.S. ___, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), on the federal sentencing guidelines.
 
 
 9
 Following argument en banc, the court entered an order affirming Hammoud's convictions and sentence. See United States v. Hammoud, 378 F.3d 426, 2004 WL 1730309 (4th Cir. August 2, 2004). We now set forth the reasoning for our judgment.
 
 I. Facts
 
 10
 The facts underlying Hammoud's convictions and sentence are largely undisputed. We therefore recount them briefly.
 
 A. Hizballah
 
 11
 Hizballah is an organization founded by Lebanese Shi'a Muslims in response to the 1982 invasion of Lebanon by Israel. Hizballah provides various forms of humanitarian aid to Shi'a Muslims in Lebanon. However, it is also a strong opponent of Western presence in the Middle East, and it advocates the use of terrorism in support of its agenda. Hizballah is particularly opposed to the existence of Israel and to the activities of the American government in the Middle East. Hizballah's general secretary is Hassan Nasserallah, and its spiritual leader is Sheikh Fadlallah.
 
 B. Hammoud
 
 12
 In 1992, Hammoud, a citizen of Lebanon, attempted to enter the United States on fraudulent documents. After being detained by the INS, Hammoud sought asylum. While the asylum application was pending, Hammoud moved to Charlotte, North Carolina, where his brothers and cousins were living. Hammoud ultimately obtained permanent resident status by marrying a United States citizen.
 
 
 13
 At some point in the mid-1990s, Hammoud, his wife, one of his brothers, and his cousins all became involved in a cigarette smuggling operation. The conspirators purchased large quantities of cigarettes in North Carolina, smuggled them to Michigan, and sold them without paying Michigan taxes. This scheme took advantage of the fact that Michigan imposes a tax of $7.50 per carton of cigarettes, while the North Carolina tax is only 50¢. It is estimated that the conspiracy involved a quantity of cigarettes valued at roughly $7.5 million and that the state of Michigan was deprived of $3 million in tax revenues.
 
 
 14
 In 1996, Hammoud began leading weekly prayer services for Shi'a Muslims in Charlotte. These services were often conducted at Hammoud's home. At these meetings, Hammoud—who is acquainted with both Nasserallah and Fadlallah, as well as Sheikh Abbas Harake, a senior military commander for Hizballah—urged the attendees to donate money to Hizballah. Hammoud would then forward the money to Harake. The Government's evidence demonstrated that on one occasion, Hammoud donated $3,500 of his own money to Hizballah.
 
 
 15
 Based on these and other activities, Hammoud was charged with various immigration violations, sale of contraband cigarettes, money laundering, mail fraud, credit card fraud, and racketeering. Additionally, Hammoud was charged with conspiracy to provide material support to a designated FTO and with providing material support to a designated FTO, both in violation of 18 U.S.C.A. § 2339B (West 2000 & Supp.2004). The latter § 2339B charge related specifically to Hammoud's personal donation of $3,500 to Hizballah.
 
 
 16
 At trial, one of the witnesses against Hammoud was Said Harb, who grew up in the same Lebanese neighborhood as Hammoud. Harb testified regarding his own involvement in the cigarette smuggling operation and also provided information regarding the provision of "dual use" equipment (such as global positioning systems, which can be used for both civilian and military activities) to Hizballah. The Government alleged that this conduct was part of the conspiracy to provide material support to Hizballah. Harb testified that Hammoud had declined to become involved in providing equipment because he was helping Hizballah in his own way. Harb also testified that when he traveled to Lebanon in September 1999, Hammoud gave him $3,500 for Hizballah.
 
 C. Conviction and Sentence
 
 17
 The jury convicted Hammoud of 14 offenses, only a few of which were particularly relevant to the calculation of Hammoud's sentence under the guidelines: money laundering and conspiracy to commit money laundering, see 18 U.S.C.A. § 1956(a)(1), (h) (West 2000 & Supp.2004); transportation of contraband cigarettes, see 18 U.S.C.A. § 2342 (West 2000); and providing material support to a designated FTO, see 18 U.S.C.A. § 2339B.
 
 
 18
 Applying the 2002 Guidelines Manual, the presentencing report (PSR) recommended that the base offense level correspond to the amount of tax evaded in the cigarette smuggling operation. See U.S. Sentencing Guidelines Manual § 2S1.1(a)(1) (2002) (requiring application of "[t]he offense level for the underlying offense from which the laundered funds were derived"); id. § 2E4.1(a) (providing that the offense level for a violation of 18 U.S.C.A. § 2342 is the greater of 9 or "the offense level from the table in § 2T4.1 (Tax Table) corresponding to the amount of the tax evaded"). The PSR concluded that the amount of tax evaded was more than $2.5 million, resulting in a base offense level of 24. See id. § 2T4.1(J). The PSR recommended several upward adjustments to this base offense level: two levels for conviction under 18 U.S.C.A. § 1956, see id. § 2S1.1(b)(2)(B); two levels for sophisticated money laundering, see id. § 2S1.1(b)(3); four levels for Hammoud's role as an organizer or leader of criminal activity that involved five or more participants, see id. § 3B1.1(a); and two levels for obstruction of justice, see id. § 3C1.1. Most significantly, the PSR recommended a 12-level enhancement for committing a terrorist act, see id. § 3A1.4(a). The terrorism enhancement also required that Hammoud be assigned to Criminal History Category (CHC) VI, see id. § 3A1.4(b); otherwise, Hammoud had no criminal history points and would have been placed in CHC I. Ultimately, the PSR recommended assignment of an adjusted offense level of 46 (to be treated as offense level 43, see id. Chapter 5, Part A, comment. (n.2)), which required a sentence of life imprisonment regardless of Hammoud's CHC.
 
 
 19
 Hammoud filed objections to the PSR, in which he challenged the factual basis for several of the upward adjustments. Hammoud also objected to the calculation of his base offense level, asserting that it was unconstitutional under Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."). Specifically, Hammoud argued that Apprendi required a jury finding, beyond a reasonable doubt, of the amount of tax loss involved in the offense. Hammoud also challenged the terrorism enhancement under Apprendi, maintaining that the enhancement was invalid without a jury finding that he possessed the requisite mental state. Hammoud made similar arguments against the enhancements for his leadership role and obstruction of justice.
 
 
 20
 The district court conducted a sentencing hearing at which it rejected all of Hammoud's sentencing challenges. The court therefore concluded that the guidelines provided for a sentence of life imprisonment. Because none of the offenses of conviction carried a statutory maximum of life imprisonment, the district court imposed the maximum sentence on each count and ordered all sentences to be served consecutively. See U.S.S.G. § 5G1.2(d). This resulted in the imposition of a sentence of 155 years.
 
 
 21
 We begin by addressing Hammoud's numerous challenges to his convictions for providing (and conspiring to provide) material support to a designated FTO. We then consider Hammoud's claim that Blakely operates to invalidate his sentence. Finally, we discuss Hammoud's other challenges to his sentence.
 
 II. Constitutionality of 18 U.S.C.A. § 2339B
 
 22
 Section 2339B, which was enacted as part of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. No. 104-132, 110 Stat. 1214, provides for a maximum penalty of 15 years imprisonment for any person who "knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so." 18 U.S.C.A. § 2339B(a)(1). The term "material support" is defined as "currency or other financial securities, financial services, lodging, training, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, transportation, and other physical assets, except medicine or religious materials." 18 U.S.C.A. § 2339A(b) (West 2000).[1]
 
 
 23
 Hammoud maintains that § 2339B is unconstitutional in a number of respects.[2] Because Hammoud failed to bring these challenges before the district court, our review is for plain error. See Fed.R.Crim.P. 52(b); United States v. Olano, 507 U.S. 725, 731-32, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). To establish plain error, Hammoud must show that an error occurred, that the error was plain, and that the error affected his substantial rights. See Olano, 507 U.S. at 732, 113 S.Ct. 1770. Even if Hammoud makes this three-part showing, correction of the error remains within our discretion, which we "should not exercise ... unless the error seriously affects the fairness, integrity or public reputation of judicial proceedings." Id. (alteration & internal quotation marks omitted).
 
 A. Freedom of Association
 
 24
 Hammoud first contends that § 2339B impermissibly restricts the First Amendment right of association. See U.S. Const. amend. I ("Congress shall make no law ... abridging ... the right of the people peaceably to assemble . . . ."). Hammoud concedes (at least for purposes of this argument) that Hizballah engages in terrorist activity. But, he also notes the undisputed fact that Hizballah provides humanitarian aid to citizens of Lebanon. Hammoud argues that because Hizballah engages in both legal and illegal activities, he can be found criminally liable for providing material support to Hizballah only if he had a specific intent to further the organization's illegal aims. Because § 2339B lacks such a specific intent requirement, Hammoud argues that it unconstitutionally restricts the freedom of association. Cf. United States v. Al-Arian, 2004 WL 1769226, at *4-*5, *7-*8 (M.D.Fla. Aug.4, 2004) (construing § 2339B as requiring proof of specific intent to further illegal activity because less stringent interpretation would raise constitutional questions regarding freedom of association and "due process requirements of personal guilt").
 
 
 25
 It is well established that "[t]he First Amendment ... restricts the ability of the State to impose liability on an individual solely because of his association with another." NAACP v. Claiborne Hardware Co., 458 U.S. 886, 918-19, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982); see Scales v. United States, 367 U.S. 203, 229, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961) (noting that a "blanket prohibition of association with a group having both legal and illegal aims ... [would pose] a real danger that legitimate political expression or association would be impaired"). Therefore, it is a violation of the First Amendment to punish an individual for mere membership in an organization that has legal and illegal goals. Any statute prohibiting association with such an organization must require a showing that the defendant specifically intended to further the organization's unlawful goals. See Elfbrandt v. Russell, 384 U.S. 11, 15-16, 86 S.Ct. 1238, 16 L.Ed.2d 321 (1966). Hammoud maintains that because § 2339B does not contain such a specific intent requirement, his conviction violates the First Amendment.[3]
 
 
 26
 Hammoud's argument fails because § 2339B does not prohibit mere association; it prohibits the conduct of providing material support to a designated FTO. Therefore, cases regarding mere association with an organization do not control. Rather, the governing standard is found in United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), which applies when a facially neutral statute restricts some expressive conduct. Such a statute is valid
 
 
 27
 if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.
 
 
 28
 Id. at 377, 88 S.Ct. 1673.
 
 
 29
 Section 2339B satisfies all four prongs of the O'Brien test. First, § 2339B is clearly within the constitutional power of the government, in view of the government's authority to regulate interactions between citizens and foreign entities. See Regan v. Wald, 468 U.S. 222, 244, 104 S.Ct. 3026, 82 L.Ed.2d 171 (1984) (holding that restrictions on travel to Cuba do not violate the Due Process Clause). Second, there can be no question that the government has a substantial interest in curbing the spread of international terrorism. See Humanitarian Law Project v. Reno, 205 F.3d 1130, 1135 (9th Cir.2000). Third, the Government's interest in curbing terrorism is unrelated to the suppression of free expression. Hammoud is free to advocate in favor of Hizballah or its political objectives—§ 2339B does not target such advocacy.
 
 
 30
 Fourth and finally, the incidental effect on expression caused by § 2339B is no greater than necessary. In enacting § 2339B and its sister statute, 18 U.S.C.A. § 2339A, Congress explicitly found that "foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct." AEDPA § 301(a)(7). As the Ninth Circuit reasoned,
 
 
 31
 [i]t follows that all material support given to [foreign terrorist] organizations aids their unlawful goals. Indeed, . . . terrorist organizations do not maintain open books. Therefore, when someone makes a donation to them, there is no way to tell how the donation is used. Further, . . . even contributions earmarked for peaceful purposes can be used to give aid to the families of those killed while carrying out terrorist acts, thus making the decision to engage in terrorism more attractive. More fundamentally, money is fungible; giving support intended to aid an organization's peaceful activities frees up resources that can be used for terrorist acts.
 
 
 32
 Humanitarian Law Project, 205 F.3d at 1136 (footnote omitted). In light of this reasoning, the prohibition on material support is adequately tailored to the interest served and does not suppress more speech than is necessary to further the Government's legitimate goal. We therefore conclude that § 2339B does not infringe on the constitutionally protected right of free association.
 
 B. Overbreadth
 
 33
 Hammoud next argues that § 2339B is overbroad. A statute is overbroad only if it "punishes a substantial amount of protected free speech, judged in relation to the statute's plainly legitimate sweep." Virginia v. Hicks, 539 U.S. 113, 118-19, 123 S.Ct. 2191, 156 L.Ed.2d 148 (2003) (internal quotation marks omitted). The overbreadth must be substantial "not only in an absolute sense, but also relative to the scope of the law's plainly legitimate applications." Id. at 120, 123 S.Ct. 2191. It is also worth noting that when, as here, a statute is addressed to conduct rather than speech, an overbreadth challenge is less likely to succeed. See id. at 124, 123 S.Ct. 2191 ("Rarely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech (such as picketing or demonstrating).").
 
 
 34
 Hammoud argues that § 2339B is overbroad because (1) it prohibits mere association with an FTO, and (2) it prohibits such plainly legitimate activities as teaching members of an FTO how to apply for grants to further the organization's humanitarian aims. As discussed above, § 2339B does not prohibit mere association with an FTO and therefore is not overbroad on that basis. Regarding Hammoud's second overbreadth argument, it may be true that the material support prohibition of § 2339B encompasses some forms of expression that are entitled to First Amendment protection.[4] Cf. Humanitarian Law Project, 205 F.3d at 1138 (holding that "training" prong of material support definition is vague because it covers such forms of protected expression as "instruct[ing] members of a designated group on how to petition the United Nations to give aid to their group"). Hammoud has utterly failed to demonstrate, however, that any overbreadth is substantial in relation to the legitimate reach of § 2339B. See Hicks, 539 U.S. at 122, 123 S.Ct. 2191 ("The overbreadth claimant bears the burden of demonstrating, from the text of the law and from actual fact, that substantial overbreadth exists." (alteration & internal quotation marks omitted)).
 
 C. Vagueness
 
 35
 Hammoud next argues that the term "material support" is unconstitutionally vague. "The void-for-vagueness doctrine requires that penal statutes define crimes so that ordinary people can understand the conduct prohibited and so that arbitrary and discriminatory enforcement is not encouraged." United States v. McLamb, 985 F.2d 1284, 1291 (4th Cir. 1993). In evaluating whether a statute is vague, a court must consider both whether it provides notice to the public and whether it adequately curtails arbitrary enforcement. See Kolender v. Lawson, 461 U.S. 352, 357-58, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983).
 
 
 36
 Section 2339B easily satisfies this standard. As noted above, the term "material support" is specifically defined as a number of enumerated actions. Hammoud relies on Humanitarian Law Project, in which the Ninth Circuit ruled that two components of the material support definition — "personnel" and "training"— were vague. See Humanitarian Law Project, 205 F.3d at 1137-38. The possible vagueness of these prongs of the material support definition does not affect Hammoud's conviction, however, because he was specifically charged with providing material support in the form of currency. See United States v. Rahman, 189 F.3d 88, 116 (2d Cir.1999) (per curiam) (rejecting vagueness challenge because allegedly vague term was not relevant to Appellant's conviction). There is nothing at all vague about the term "currency."
 
 D. Designation of an FTO
 
 37
 Hammoud's final challenge to the constitutionality of § 2339B concerns his inability to challenge the designation of Hizballah as an FTO. Section 2339B(g)(6) defines "terrorist organization" as "an organization designated [by the Secretary of State] as a terrorist organization under [8 U.S.C.A. § 1189 (West 1999 & Supp. 2004)]." Section 1189(a)(8) explicitly prohibits a defendant in a criminal action from challenging a designation. Hammoud argues that his inability to challenge the designation of Hizballah as an FTO is a violation of the Constitution.
 
 
 38
 Hammoud primarily argues that § 1189(a)(8) deprives him of his constitutional right to a jury determination of guilt on every element of the charged offense.[5] See United States v. Gaudin, 515 U.S. 506, 509-10, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995) (holding that the Fifth and Sixth Amendments "require criminal convictions to rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt"). This right has not been violated, however. "[I]n determining what facts must be proved beyond a reasonable doubt the ... legislature's definition of the elements of the offense is usually dispositive. . . ." McMillan v. Pennsylvania, 477 U.S. 79, 85, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986). Here, Congress has provided that the fact of an organization's designation as an FTO is an element of § 2339B, but the validity of the designation is not. Therefore, Hammoud's inability to challenge the designation is not a violation of his constitutional rights. See United States v. Bozarov, 974 F.2d 1037, 1045-46 (9th Cir.1992) (holding that defendant's inability to challenge administrative classification did not violate due process because the validity of the classification was not an element of the offense).
 
 
 39
 Hammoud next argues that § 1189(a) violates the nondelegation doctrine because the designation of an organization as an FTO is not subject to judicial review. In the first place, it is not clear whether the nondelegation doctrine requires any form of judicial review. Compare Bozarov, 974 F.2d at 1041-45 (rejecting claim that a congressional delegation of authority was unconstitutional because the agency's action was not subject to judicial review), with Touby v. United States, 500 U.S. 160, 168-69, 111 S.Ct. 1752, 114 L.Ed.2d 219 (1991) (rejecting claim that temporary regulation violated nondelegation doctrine on basis that permanent regulation was subject to judicial review and temporary regulation could be challenged in criminal proceedings). In any event, an FTO designation is subject to judicial review —the designation may be challenged by the organization itself, see 8 U.S.C.A. § 1189(b).
 
 III. Surveillance Evidence
 A. FISA Materials
 
 40
 At trial, the Government introduced into evidence several recorded telephone conversations between Hammoud and others. These recordings were obtained through a wiretap pursuant to the Foreign Intelligence Surveillance Act of 1978 (FISA), 50 U.S.C.A. §§ 1801-1862 (West 2003 & Supp.2004). Hammoud argues that the wiretap authorization was not based upon probable cause; that the official certification that the wiretaps were seeking foreign intelligence information was clearly erroneous; and that the Government failed to take adequate measures to ensure that the invasion of Hammoud's privacy was no greater than necessary.
 
 
 41
 FISA was enacted to create a framework whereby the Executive could conduct electronic surveillance for foreign intelligence purposes without violating the rights of citizens. See United States v. Squillacote, 221 F.3d 542, 552 (4th Cir. 2000). FISA created a special court composed of district court judges appointed by the Chief Justice of the United States; with certain exceptions not relevant here, a FISA judge must approve in advance all electronic surveillance of a foreign power or its agents. See 50 U.S.C.A. §§ 1802, 1804.
 
 1. Probable Cause
 
 42
 Before authorizing surveillance, a FISA judge must determine that there is probable cause to believe that, as is relevant here, "the target of the electronic surveillance is ... an agent of a foreign power" and that "each of the facilities or places at which the electronic surveillance is directed is being used, or is about to be used, by... an agent of a foreign power." 50 U.S.C.A. § 1805(a)(3). A "foreign power" includes "a group engaged in international terrorism or activities in preparation therefor." Id. § 1801(a)(4). An "agent of a foreign power" is "any person who ... knowingly engages in sabotage or international terrorism, or activities that are in preparation therefor, for or on behalf of a foreign power." Id. § 1801(b)(2)(C). Hammoud concedes that Hizballah is a foreign power under FISA, but he argues that the Government did not have probable cause to believe that he was an agent of Hizballah.
 
 
 43
 "[P]robable cause is a fluid concept —turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." Illinois v. Gates, 462 U.S. 213, 232, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). In evaluating whether probable cause exists, it is the task of the issuing judge "to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit . . ., there is a fair probability" that the search will be fruitful. Id. at 238, 103 S.Ct. 2317; see Mason v. Godinez, 47 F.3d 852, 855 (7th Cir.1995) ("Probable cause means more than bare suspicion but less than absolute certainty that a search will be fruitful.").
 
 
 44
 Hammoud's motion to suppress the FISA evidence was referred to a magistrate judge, who reviewed the FISA applications and supporting materials in camera and concluded that there was probable cause to believe that Hammoud was an agent of a foreign power. See 50 U.S.C.A. § 1806(f). The magistrate judge therefore recommended denial of the motion to suppress. The district court adopted this recommendation after considering Hammoud's objections to the report and recommendation, independently reviewing the materials, and conducting a hearing.
 
 
 45
 Having conducted our own de novo review of the materials, see Squillacote, 221 F.3d at 554, we reach the same conclusion as the magistrate judge and the district court. Further, upon review of the materials we are satisfied that the probable cause finding was not based "solely upon... activities protected by the first amendment to the Constitution of the United States." 50 U.S.C.A. § 1805(a)(3)(A). We will not elaborate on the contents of the materials in light of the Attorney General's assessment that disclosure of the information contained in the application and supporting documents would endanger national security.
 
 2. Certification
 
 46
 An application for a FISA warrant must include a certification by an executive branch official stating, inter alia, that the information sought is foreign intelligence information and that the purpose of the surveillance is to obtain such information.[6] See id. § 1804(a)(7). When the target of surveillance is a United States person, the FISA judge must find that the certification is not clearly erroneous before issuing a warrant. See id. § 1805(a)(5). "A finding is `clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948).
 
 
 47
 Hammoud asserts that the certification was clearly erroneous for two reasons. First, he maintains that the Government failed to demonstrate that the information it sought to obtain through the proposed electronic surveillance was foreign intelligence information. Second, he claims that obtaining foreign intelligence information was not the "primary purpose" of the surveillance; rather, the purpose of the surveillance was to obtain evidence for use in the criminal investigation. Cf. United States v. Truong Dinh Hung, 629 F.2d 908, 915-16 (4th Cir.1980) (suppressing fruits of electronic surveillance after date that investigation of defendant became "primarily a criminal investigation").
 
 a. Foreign Intelligence Information
 
 48
 FISA defines "foreign intelligence information" in pertinent part as
 
 
 49
 information that relates to, and if concerning a United States person is necessary to, the ability of the United States to protect against—
 
 
 50
 (A) actual or potential attack or other grave hostile acts of a foreign power or an agent of a foreign power;
 
 
 51
 (B) sabotage or international terrorism by a foreign power or an agent of a foreign power; or
 
 
 52
 (C) clandestine intelligence activities by ... an agent of a foreign power....
 
 
 53
 50 U.S.C.A. § 1801(e)(1). We reject Hammoud's contention that there is no evidence to support the Government's certification regarding the character of the information sought to be obtained through electronic surveillance of Hammoud. The materials submitted in connection with the FISA application warrant a conclusion that the certification was not clearly erroneous.
 
 b. Primary Purpose
 
 54
 The Government disputes that FISA requires the collection of foreign intelligence information to be the "primary purpose" of electronic surveillance. Among other things, it notes that Truong, in which this court first articulated the primary purpose test, was a pre-FISA decision. See generally In re Sealed Case, 310 F.3d 717, 722-27 (Foreign Int.Surv.Ct.Rev.2002) (per curiam) (tracing history of primary purpose requirement and concluding that requirement is not supported by text or legislative history of FISA). However, even if the primary purpose test applies, it is satisfied here. The information in the affidavit supports a conclusion that the FBI was primarily interested in obtaining foreign intelligence information.[7]
 
 3. Minimization
 
 55
 In his last challenge to the FISA evidence, Hammoud argues that the Government failed to minimize the surveillance of him, as FISA requires. See 50 U.S.C.A. § 1805(a)(4); id. § 1801(h)(1) (defining "minimization procedures" as "specific procedures... that are reasonably designed... to minimize the acquisition and retention, and prohibit the dissemination, of nonpublicly available information concerning unconsenting United States persons"). Hammoud's entire argument on this point consists of two assertions: that "[t]he surveillance records contained no foreign intelligence information" and that the records "contain many conversations about personal matters unrelated to any crime." Br. for Appellant Mohamad Y. Hammoud at 51. We take Hammoud's argument to be that the minimization procedures must have been inadequate because many personal conversations were recorded and obtained during the course of the surveillance.
 
 
 56
 In enacting FISA, Congress recognized that "no electronic surveillance can be so conducted that innocent conversations can be totally eliminated." S.Rep. No. 95-701, at 39 (1978) (internal quotation marks omitted), reprinted in 1978 U.S.C.C.A.N. 3973, 4008. The minimization requirement obligates the Government to make a good faith effort to minimize the acquisition and retention of irrelevant information. See id. at 39-40. However, it is not always immediately clear into which category a particular conversation falls. A conversation that seems innocuous on one day may later turn out to be of great significance, particularly if the individuals involved are talking in code. Cf. United States v. Salameh, 152 F.3d 88, 154 (2d Cir.1998) (per curiam) (noting that two conspirators involved in the 1993 bombing of the World Trade Center in New York referred to the plot as the "study" and to relevant materials as "university papers"). In view of these considerations, the mere fact that innocent conversations were recorded, without more, does not establish that the government failed to appropriately minimize surveillance.
 
 B. Canadian Intelligence Summaries
 
 57
 Between February 1996 and September 2000, the Canadian Security Intelligence Service (CSIS) conducted electronic surveillance of a coconspirator in Canada. A number of these recordings were destroyed pursuant to routine procedures. However, summaries and analysis of the conversations were prepared by a CSIS communications analyst shortly after each conversation was recorded. At trial, the Government sought to introduce the factual portions of some of these summaries (the analysis was redacted from the summaries before submission to the jury).
 
 
 58
 During pretrial proceedings, the district court ruled that the CSIS summaries were admissible as recorded recollections, see Fed.R.Evid. 803(5), and as public records, see id. Rule 803(8). At trial, Hammoud stipulated to the admissibility of the summaries. See J.A. 2827 ("Your Honor, with respect to these exhibits, there's a stipulation among the parties that the Canadian Security Intelligence Service's factual summaries are admissible pursuant to Federal Rule of Evidence 803(5), past recollection recorded exception to hearsay rules and that they are authentic and accurate.").
 
 
 59
 Hammoud now maintains that admission of the summaries was error. However, all of his arguments are negated by his stipulation; thus, Hammoud waived any objection. See United States v. Aptt, 354 F.3d 1269, 1280 (10th Cir.2004) (explaining that "[a] defendant is free to waive objections to evidence by stipulation" and that "admission of a stipulated exhibit is not error..., even if it would not be admissible in the absence of such a stipulation").
 
 IV. Expert Testimony
 
 60
 During trial, the district court allowed Matthew Levitt to testify as an expert regarding terrorist organizations and Hizballah. Hammoud argues that the admission of Levitt's testimony was improper on two grounds: first, that the testimony should have been excluded in light of the Government's failure to comply with a discovery order; and second, that Levitt's testimony failed the standard for the admissibility set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Hammoud also argues that the district court abused its discretion in refusing to allow him to cross-examine Levitt regarding classified matters. We reject all three of these claims.
 
 A. Rule 16 Violation
 
 61
 The district court ordered the Government to produce all discovery by October 31, 2001; the order stated that "[d]iscovery produced after that date will not be admitted at trial absent a showing of extreme need." J.A. 347. On November 1, the Government filed a notice of compliance which included a section entitled "Discovery material not yet available to defendants." Id. at 367. In this section, the Government informed the court that it was still seeking the aid of an expert on Hizballah. The Government also acknowledged that it would have to obtain leave of the court prior to offering such expert testimony at trial. In response to a motion filed by Hammoud's codefendant (Chawki Hammoud, who is Hammoud's brother), the Government informed the court on December 11 that it still had not obtained an expert on Hizballah; the Government stated that "[w]hen it has [found an expert], notice will be given and litigation, including the timeliness of disclosure, can commence." Id. at 410. In the meantime, the Government requested that the motions deadline be extended to account for ongoing discovery.
 
 
 62
 On April 10, 2002, the Government filed a notice of its intent to call Levitt, see Fed.R.Crim.P. 16(a)(1)(G),[8] and requested leave of the court to admit Levitt's testimony. The Government noted that Levitt expected to complete a summary of his testimony by April 26, at which point it would be submitted to the defense. The Government filed the notice and summary on May 3.
 
 
 63
 At a hearing concerning the timeliness of the disclosure, Hammoud's attorney argued that he did not have adequate time to prepare to cross-examine Levitt. However, defense counsel also told the court that neither he nor Hammoud wanted a continuance. Noting that the Government had kept the court and defense counsel apprized of its search for an expert, the district court declined to sanction the Government by excluding Levitt's testimony.
 
 
 64
 Rule 16 grants the district court substantial discretion in dealing with a violation of a discovery order.[9] See Fed.R.Crim.P. 16(d)(2) (providing that a failure to comply may be remedied by an order directing compliance, a continuance, exclusion of the evidence, or "any other order that is just under the circumstances"); see also United States v. Lopez, 271 F.3d 472, 483 (3d Cir.2001) ("[O]n its face, the Rule does not require a district court to do anything—Rule 16 merely states that the court `may' take [one of the enumerated] actions."). In determining what sanction, if any, to impose for a discovery violation, the district court
 
 
 65
 must weigh the reasons for the government's delay and whether it acted intentionally or in bad faith; the degree of prejudice, if any, suffered by the defendant; and whether any less severe sanction will remedy the prejudice and the wrongdoing of the government.
 
 
 66
 United States v. Hastings, 126 F.3d 310, 317 (4th Cir.1997). The court must impose the least severe sanction that will "adequately punish the government and secure future compliance." Id. A continuance is the preferred sanction. See United States v. Golyansky, 291 F.3d 1245, 1249 (10th Cir.2002) ("It would be a rare case where, absent bad faith, a district court should exclude evidence rather than continue the proceedings."). The sanction decision is reviewed for abuse of discretion. See Hastings, 126 F.3d at 316.
 
 
 67
 Here, the district court acknowledged the Government's discovery violation but elected not to impose a sanction after defense counsel declined to accept a continuance. Its refusal to exclude Levitt's testimony was not an abuse of discretion. The Government made clear, well before the discovery deadline, that it was seeking an expert to testify that Hammoud was the leader of a Hizballah cell. Additionally, the Government detailed its difficulties in obtaining such an expert and promptly identified Levitt when he had been retained. Under these circumstances, the district court did not abuse its discretion in refusing to exclude Levitt's testimony.
 
 B. Daubert
 
 68
 Federal Rule of Evidence 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." The Supreme Court has held that Rule 702 requires the district court to perform a gatekeeping function to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Daubert, 509 U.S. at 589, 113 S.Ct. 2786.
 
 
 69
 When, as here, the proffered expert testimony is not scientific in nature, the district court must still perform the gatekeeping function. See Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147-49, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). In determining whether proffered expert testimony is reliable, the district court has broad discretion to consider whatever factors bearing on validity that the court finds to be useful; the particular factors will depend upon the unique circumstances of the expert testimony involved. See id. at 152-53, 119 S.Ct. 1167. "The court, however, should be conscious of two guiding, and sometimes competing, principles": (1) "that Rule 702 was intended to liberalize the introduction of relevant expert evidence"; and (2) "that due to the difficulty of evaluating their testimony, expert witnesses have the potential to be both powerful and quite misleading." Westberry v. Gislaved Gummi AB, 178 F.3d 257, 261 (4th Cir.1999) (internal quotation marks omitted).
 
 
 70
 The district court conducted a Daubert hearing, during which Levitt testified that his expertise regarding Hizballah derived from his previous experience with the FBI and his current employment with a think tank, at which he specialized in Middle Eastern terrorist groups. Levitt testified that as part of his duties, he spent "a lot of [his] time ... on Hizballah." J.A. 2357. Levitt described his general methodology as follows:
 
 
 71
 Well, we're talking about a social science here. This is not scientific research. Basic academic intellectual research combined with the techniques I was taught in ... various courses I took as an analyst for the government both taught that the best way to go about making sense of something in the social sciences is to collect as much information as possible and to balance each new incoming piece of information against the body of information that you've built to that point.
 
 
 72
 . . . .
 
 
 73
 . . . So it's a constant vetting process. And the more rigorous you are, the better your information will be.
 
 
 74
 J.A. 2344-45. Levitt further testified that his work was subject to "tremendous peer review," id. at 2345, and that his regular practice was to discuss his findings and conclusions with others to ensure their soundness. Levitt stated that he followed this process in reaching his opinion in this case.
 
 
 75
 In view of this testimony, the district court did not abuse its discretion in qualifying Levitt as an expert. Levitt identified his methodology as one generally employed in the social sciences, and Hammoud did not challenge this testimony. Additionally, Levitt testified that he actually applied this methodology in reaching his conclusions regarding this case.
 
 
 76
 Hammoud also argues that Levitt's testimony should have been excluded on the grounds that it was not helpful to the jury. Again, the district court did not abuse its discretion. Levitt testified regarding the structure of Hizballah and identified its leaders. Levitt also explained the significance of Hammoud's contact with those leaders (most notably Sheikh Fadlallah, the spiritual leader of Hizballah). And, Levitt discussed the nature of Hizballah's funding activities with specific reference to Hammoud's activities. This testimony was critical in helping the jury understand the issues before it.
 
 C. Classified Information
 
 77
 During the Daubert hearing and at trial, the district court prohibited defense counsel from questioning Levitt regarding classified matters relating to Levitt's employment with the FBI. Hammoud maintains that this restriction violated the Classified Information Procedures Act (CIPA), 18 U.S.C.A.App. 3 §§ 1-16 (West 2000 & Supp.2004), and the Confrontation Clause of the Sixth Amendment. We reject both of these contentions.
 
 1. CIPA
 
 78
 CIPA was enacted in 1980 to combat the problem of "graymail," an attempt by a defendant to derail a criminal trial by threatening to disclose classified information. See S.Rep. No. 96-823, at 2 (1980), reprinted in 1980 U.S.C.C.A.N. 4294, 4295; see also id. at 3 (noting that problem of graymail is not "limited to instances of unscrupulous or questionable conduct by defendants since wholly proper defense attempts to obtain or disclose classified information may present the government with the same `disclose or dismiss' dilemma" (internal quotation marks omitted)), reprinted in 1980 U.S.C.C.A.N. at 4296-97. CIPA requires a criminal defendant who "reasonably expects to disclose or to cause the disclosure of classified information in any manner in connection with any trial or pretrial proceeding" to notify the district court and the Government "within the time specified by the court or, where no time is specified, within thirty days prior to trial." 18 U.S.C.A.App. 3 § 5(a). The Government may then request a hearing, at which the district court must determine whether the classified information in question is relevant and admissible. See id. § 6(a).
 
 
 79
 During the course of the Daubert hearing regarding Levitt's expert testimony, the district court refused to allow Hammoud to cross-examine Levitt regarding classified matters relating to Levitt's former employment with the FBI. Hammoud argues that this information was relevant and material to his cross-examination of Levitt and that its non-disclosure violated CIPA; he further maintains that the proper remedy for the non-disclosure is exclusion of Levitt's testimony. We disagree.
 
 
 80
 The triggering event for the imposition of sanctions under CIPA is the Government's refusal to comply with an order of the district court directing the disclosure of classified information. See 18 U.S.C.A.App. 3 § 6(e). Such a refusal must necessarily be preceded by a district court determination that the classified information is relevant and admissible. See id.; United States v. Smith, 780 F.2d 1102, 1105 (4th Cir.1985) (en banc). Here, however, the district court determined that the classified information related to Levitt's work at the FBI was not relevant because he did not rely on that information in forming his opinion. Because the district court never ordered the disclosure of classified information (and properly so, as we discuss below), the Government never had occasion to refuse to produce the information. We therefore conclude that CIPA is not implicated.[10]
 
 2. Confrontation Clause
 
 81
 Hammoud next maintains that the district court violated his Sixth Amendment right to confront the witnesses against him when the court refused to allow him to cross-examine Levitt regarding classified matters. We conclude that this claim fails because Levitt did not rely on any classified information in forming his opinion regarding Hammoud's membership in Hizballah.
 
 
 82
 The Constitution guarantees the right of a criminal defendant "to be confronted with the witnesses against him." U.S. Const. amend. VI. "The main and essential purpose of confrontation is to secure for the [defendant] the opportunity of cross-examination." Davis v. Alaska, 415 U.S. 308, 315-16, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) (emphasis & internal quotation marks omitted). Indeed, "[c]ross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." Id. at 316, 94 S.Ct. 1105. Nevertheless, the district court retains "wide latitude ... to impose reasonable limits on ... cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). We review such limitations for abuse of discretion. See United States v. Turner, 198 F.3d 425, 429 (4th Cir.1999).
 
 
 83
 In support of this claim, Hammoud relies on United States v. Baptista-Rodriguez, 17 F.3d 1354 (11th Cir.1994), in which the Eleventh Circuit ruled that the defendant (Diaz) suffered a Confrontation Clause violation when the district court prohibited him from cross-examining a witness regarding the existence and contents of a classified document. See id. at 1366-67. The document in question related to Diaz's defense that he was working with the FBI at the time of the drug transaction with which he was charged. See id. at 1366-68.
 
 
 84
 The Government, in contrast, relies on two First Circuit cases, United States v. Angiulo (Angiulo I), 847 F.2d 956 (1st Cir.1988), and United States v. Angiulo (Angiulo II), 897 F.2d 1169 (1st Cir.1990), both of which involved expert testimony regarding the defendants' relationship to La Cosa Nostra. See Angiulo II, 897 F.2d at 1187; Angiulo I, 847 F.2d at 973. The district court prohibited the defendants in each case from questioning the expert about the identity of the informants whose information formed much of the basis for the expert's knowledge of La Cosa Nostra. The First Circuit affirmed, reasoning:
 
 
 85
 [T]he experts acknowledged that information gleaned from informants over the course of their FBI careers was part of the vast mix of material that contributed to their background expertise on La Cosa Nostra. This expertise, in turn, enabled them to listen to the tapes and form opinions on defendants' criminal activities. The fact that informant information furnished some part of the experts' background knowledge does not implicate the sixth amendment. Regardless of the information that contributed to their background expertise, the experts' testimony regarding the particular charges against these defendants was based solely on an analysis of the tape recordings [that were played at trial]. Angiulo II, 897 F.2d at 1188; see Angiulo I, 847 F.2d at 974 (employing similar reasoning).
 
 
 86
 We agree with the Government that the situation before us is more akin to the Angiulo cases than to Baptista-Rodriguez. Levitt stated during the Daubert hearing that while his general knowledge regarding Hizballah derived in part from his classified work with the FBI, he did not rely on any classified information in forming his opinion regarding Hammoud's relationship to Hizballah. Rather, as did the experts in the Angiulo cases, Levitt based his opinion regarding Hammoud's Hizballah membership on unclassified surveillance evidence obtained by the Government during the course of its investigation. The classified information therefore was not relevant to the question of Hammoud's guilt, and the district court did not abuse its discretion in refusing to allow cross-examination regarding classified materials.
 
 V. Videotapes
 
 87
 Hammoud next asserts that the district court abused its discretion in allowing the Government to play for the jury some of the Hizballah videotapes found in his apartment. Hammoud claims that the contents of the tapes were irrelevant and, alternatively, that if the tapes were relevant, they were unduly prejudicial. See Fed.R.Evid. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . .").[11] Hammoud also argues that the manner in which the Government presented the videotape evidence unfairly prejudiced him. We review the evidentiary rulings of the district court for abuse of discretion. See United States v. Leftenant, 341 F.3d 338, 342 (4th Cir.2003), cert. denied, ___ U.S. ___, 124 S.Ct. 1183, 157 L.Ed.2d 1215 (2004). Hammoud's challenge to the means of presenting the videotape evidence will succeed only if "the conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process." United States v. Scheetz, 293 F.3d 175, 185 (4th Cir.2002) (internal quotation marks omitted).
 
 A. Relevance
 
 88
 The indictment alleged that as one of the overt acts of the conspiracy to provide material support to an FTO, Hammoud conducted meetings in his home during which he spoke about Hizballah operations and played Hizballah videotapes. At trial, the Government sought to prove that the meetings were not solely religious meetings, as Hammoud contended, but rather were integral to the operation of a Hizballah cell in Charlotte. In support of this claim, the Government played excerpts from some of the videotapes seized from Hammoud's home. The segments played by the Government included speeches by Hizballah leaders praising men who had martyred themselves and crowds shouting "Death to America" and "Death to Israel." J.A. 2225. Another tape depicted a group swearing to become martyrs "to shake the grounds under our enemies, America and Israel." Id. at 2388 (internal quotation marks omitted). Most significantly, some of the tapes depicted Hizballah military operations and encouraged donations from those who could not participate directly in Hizballah operations.
 
 
 89
 We conclude that the district court did not abuse its discretion in ruling that the excerpts played for the jury were relevant. The excerpts played for the jury are probative of Hammoud's intent during the prayer meetings — i.e., to solicit donations to Hizballah — and his knowledge of, and agreement with, the terrorist objectives of Hizballah.
 
 B. Unfair Prejudice
 
 90
 Hammoud also argues that even if the tapes were relevant, they should have been excluded because their probative value was substantially outweighed by the danger of unfair prejudice. Rule 403 requires exclusion of evidence "only in those instances where the trial judge believes that there is a genuine risk that the emotions of the jury will be excited to irrational behavior, and that this risk is disproportionate to the probative value of the offered evidence." United States v. Powers, 59 F.3d 1460, 1467 (4th Cir.1995) (internal quotation marks omitted). The mere fact that the evidence will damage the defendant's case is not enough — the evidence must be unfairly prejudicial, and the "unfair prejudice must substantially outweigh the probative value of the evidence." United States v. Grimmond, 137 F.3d 823, 833 (4th Cir.1998) (internal quotation marks omitted) (emphasis added).
 
 
 91
 In advocating for the admissibility of the video excerpts, the Government relies on United States v. Salameh, 152 F.3d 88 (2d Cir.1998) (per curiam). In Salameh, the Second Circuit addressed a Rule 403 challenge to the admission of certain materials — including a video of the bombing of an American embassy and instructions for making bombs — in the trial of those accused of the 1993 World Trade Center bombing. See id. at 110. The court concluded that the district court had not abused its discretion in ruling that the materials were not unfairly prejudicial, reasoning that even though the items "bristled with strong anti-American sentiment and advocated violence against targets in the United States," the danger of unfair prejudice did not substantially outweigh the probative value of the evidence. Id. at 111.
 
 
 92
 In arguing that the video excerpts were unfairly prejudicial, Hammoud relies on United States v. Ham, 998 F.2d 1247 (4th Cir.1993), and United States v. Merino-Balderrama, 146 F.3d 758 (9th Cir.1998). In Ham, this court reversed a conviction on the basis that evidence of defendants' homosexuality and of rampant child molestation in a religious community headed by the defendants was unduly prejudicial. See Ham, 998 F.2d at 1252-54. We concluded that the evidence was highly prejudicial and that its probative impact was limited because, although relevant to prove motive for the charged murder, it was neither "direct" nor "essential" proof of motive. Id. at 1253.
 
 
 93
 In Merino-Balderrama, the Ninth Circuit reversed a conviction for possession of child pornography on the basis that the district court abused its discretion in allowing the Government to play for the jury excerpts of films containing child pornography that had been found in the defendant's possession. See Merino-Balderrama, 146 F.3d at 760. The defendant had offered to stipulate that the tapes contained child pornography. The court held that in view of the proffered stipulation, the Government would only be required prove scienter, i.e., that the defendant knew the films contained child pornography. And, the court concluded that in light of the covers of the films — photographs making clear that the film was child pornography — the probative value of the contents of the films was outweighed by their prejudicial impact. See id. at 762-63.
 
 
 94
 We conclude that the district court did not abuse its discretion in allowing the Government to play portions of the tapes for the jury. As noted above, the Government was required to demonstrate that Hammoud knew of Hizballah's unlawful activities, and the contents of the videos were probative evidence of Hammoud's knowledge. The tapes also provided evidence of Hammoud's motive in raising funds for Hizballah and tended to contradict Hammoud's claim that he sympathized only with the humanitarian goals of the organization. See Salameh, 152 F.3d at 111 (noting that even though motive is not an element of any offense, "evidence offered to prove motive is commonly admitted"). This case is thus unlike Ham, in which the proffered evidence was neither directly relevant to motive nor highly probative of motive. And, unlike in Merino-Balderrama, there was no less prejudicial alternative for the Government in proving Hammoud's knowledge of Hizballah's activities.[12]
 
 C. Manner of Presentation
 
 95
 Hammoud also challenges the manner in which the Government presented the videotapes, arguing that the tapes were repeatedly rewound and replayed in order to heighten their prejudicial impact. The record does not bear out this claim. The Government played the tapes for the jury while a linguist translated the statements being made. At several points, the linguist asked for the tape to be rewound because his translation had fallen behind the action on the video. The following is a representative episode:
 
 
 96
 Our slogan was, is and will remain to be Death to Israel. And the crowd repeats the same thing three times.
 
 
 97
 Mr. Nasserallah says, And along The Resistance path — can you rewind it just a little?
 
 
 98
 It says, Along The Resistance path, our bodies bleed, our bodies fall to the ground and our heads tumble above our heads — I'm sorry, our houses tumble above our heads.
 
 
 99
 It says — I'm sorry, can you rewind just a little bit? Okay. He talks — I missed that part because of the rewinding, but he talks about The Resistance continues....
 
 
 100
 J.A. 2227. We see nothing improper or prejudicial in rewinding the videos so that the translator could keep up.
 
 
 101
 Hammoud further asserts that it was improper for the Government to use a translator at all — he contends that the Government should have simply played the tapes and allowed the jury to follow along with a printed translation. We disagree. It would have been exceedingly difficult, if not impossible, for a jury to follow along with a written, English translation of a videotape filmed entirely in Arabic. The district court did not abuse its discretion in determining that playing the video with simultaneous oral translation was a more effective and helpful way of presenting the evidence to the jury.
 
 VI. Miscellaneous Challenges to Convictions
 
 102
 Hammoud raises several additional challenges to his convictions that may be addressed more briefly.
 
 A. Constructive Amendment
 
 103
 Count 71 of the indictment alleged that the Charlotte Hizballah cell was a racketeering enterprise, one of the purposes of which was the donation of illegally acquired funds to Hizballah. Count 72 of the indictment charged Hammoud and others with conspiracy to provide material support to a designated FTO. Count 72 included allegations regarding Hammoud's activities in Charlotte as well as Said Harb's involvement in procuring "dual-use" equipment in Canada. Hammoud argues that the Government (through its presentation of evidence and closing argument) and the district court (through its instructions to the jury) constructively amended the indictment by effectively combining counts 71 and 72 into a single charge. See United States v. Floresca, 38 F.3d 706, 710 (4th Cir.1994) (en banc) ("A constructive amendment to an indictment occurs when either the government ..., the court ..., or both, broadens the possible bases for conviction beyond those presented by the grand jury.").
 
 
 104
 Counts 71 and 72 were clearly separate charges, and the district court properly instructed the jury as to each. During his closing argument, Hammoud's counsel argued that while the indictment charged a single conspiracy in count 72, the evidence supporting that count actually demonstrated the existence of two conspiracies — one in Canada, involving the procurement of equipment, and one in Charlotte.[13] In response to this claim, the Government argued in rebuttal that the evidence in support of count 72 established the existence of a single conspiracy.
 
 
 105
 During deliberations, the jury repeatedly asked questions about count 72, even after it had reached a verdict on all of the other counts, including count 71. In particular, the jury asked whether, in order to convict, it had to conclude that the Canadian activities and the Charlotte activities were part of the same conspiracy. In response, and apparently without objection from Hammoud, the district court repeated its instruction regarding single and multiple conspiracies.
 
 
 106
 Subsequently, the jury asked a question that neither the court nor the parties understood: "Do we have to find one conspiracy or a conspiracy out of multiple utilizing only some of the manner and means of conspiracy." J.A. 3648 (internal quotation marks omitted). The response of the court, as recorded in the transcript, was equally confusing: "You must find, in order to convict on Count 72, that there was a single conspiracy, not multiple conspiracies. Multiple conspiracies with a common goal. Not what was charged." Id. The first sentence is a correct instruction; the second and third sentences, however, arguably contradicted it. A short time later, the jury asked two additional questions: "Is Count 72 that there's one single and only one conspiracy to be proved?" and "Does it necessarily have to include all of the matter and means of the conspiracy as alleged in the count?" Id. at 3649 (internal quotation marks omitted). The district court correctly answered the first question "yes" and the second question "no."
 
 
 107
 Hammoud construes all of this discussion regarding count 72 as a discussion regarding counts 71 and 72, and he alleges that the district court improperly combined the two counts. As should be clear from the above discussion, this is not at all what happened. All of the questions from the jury concerned whether count 72 involved a single conspiracy or multiple conspiracies. Therefore, there was no constructive indictment.
 
 B. Cross-Examination of Hammoud
 
 108
 Hammoud testified in his own defense, asserting that he supported the humanitarian work of Hizballah but not its terrorist activities. On cross-examination, the Government questioned Hammoud regarding his awareness of violent acts by Hizballah. Hammoud now asserts that such questions constituted "fearmongering" and violated his right to a fair trial. We conclude that there was no error here because the prosecutor's questions were intended to undermine Hammoud's claim that he supported only the humanitarian aims of Hizballah and that he disagreed with the violent tactics employed by Hizballah.
 
 C. Testimony Regarding Dual-Use Equipment
 
 109
 In his final challenge to his convictions, Hammoud asserts that the district court should not have allowed expert testimony regarding the possible aviation applications of equipment purchased in Canada by Said Harb and others, arguing that the sole purpose of such testimony was to "instill[ ] fear and prejudice in a post-September 11 jury." Br. for Appellant Mohamad Y. Hammoud at 112. We agree with the Government that this testimony was relevant to prove the "material support" conspiracy charged in Count 72 of the indictment and was not unfairly prejudicial.
 
 
 110
 The admission of this testimony was not plain error.
 
 VII. Blakely v. Washington
 
 111
 We now turn to the issue that prompted us to hear this case en banc: the effect of Blakely on the federal sentencing guidelines.[14] The question we must address is whether the rationale of Blakely (and Apprendi before it) requires indictment and a jury finding, beyond a reasonable doubt, of facts that result in an increase in the offense level and corresponding guideline range. Little more than a month after Blakely was handed down, the federal courts are already divided over this question. The Seventh and Ninth Circuits have ruled that Blakely does impact the guidelines. See United States v. Ameline, 376 F.3d 967, 974 (9th Cir.2004); United States v. Booker, 375 F.3d 508, 511 (7th Cir.2004) ("Blakely dooms the guidelines insofar as they require that sentences be based on facts found by a judge."), cert. granted, ___ U.S. ___, 125 S.Ct. 11, ___ L.Ed.2d ___, 73 USLW 3073 (U.S. Aug. 2, 2004) (No. 04-104). In contrast, the Fifth and Sixth Circuits have held that Blakely does not affect the guidelines. See United States v. Koch, 2004 WL 1870438, at *1 (6th Cir. Aug.13, 2004) (en banc) (order affirming judgment of the district court) ("We hold ... that the decision of the U.S. Supreme Court in Blakely ... does not invalidate the appellant's sentence under the federal Sentencing Guidelines."); United States v. Pineiro, 377 F.3d 464, 465-66 (5th Cir.2004) ("Having considered the Blakely decision, prior Supreme Court cases, and our own circuit precedent, we hold that Blakely does not extend to the federal Guidelines ...."). The Second Circuit certified questions regarding the application of Blakely to the guidelines to the Supreme Court, see United States v. Penaranda, 375 F.3d 238, 247 (2d Cir. 2004), but in the meantime has declined to apply Blakely to the guidelines, see United States v. Mincey, 380 F.3d 102, 2004 WL 1794717, at *3 (2d Cir. Aug.12, 2004) (per curiam). Other circuits have acknowledged the potential impact of Blakely on the guidelines but have not directly addressed the question. See, e.g., United States v. Duncan, 381 F.3d 1070, 1075-76, 2004 WL 1838020, at *3-*5 (11th Cir. Aug.18, 2004) (holding that any Blakely error was not "plain" under plain error standard of review); United States v. Cianci, 378 F.3d 71, 107 (1st Cir.2004) (deferring decision on sentencing issues pending supplemental briefing regarding Blakely). And, on the day we heard argument in this case, the Supreme Court granted certiorari in two cases involving Blakely and the federal sentencing guidelines. See United States v. Booker, ___ U.S. ___, 125 S.Ct. 11, ___ L.Ed.2d ___, 73 U.S.L.W. 3073 (U.S. Aug. 2, 2004) (No. 04-104); United States v. Fanfan, ___ U.S. ___, 125 S.Ct. 12, ___ L.Ed.2d ___, 73 U.S.L.W. 3073 (U.S. Aug. 2, 2004) (No. 04-105). These cases are scheduled for argument on October 4, 2004.
 
 
 112
 On close examination of Blakely, we conclude that the Supreme Court simply applied — and did not modify — the rule articulated in Apprendi. We have previously held that the rule of Apprendi does not affect the application of the guidelines. See United States v. Kinter, 235 F.3d 192, 198-202 (4th Cir.2000). Nothing in Blakely requires us to abandon our prior holding. We therefore decline to apply the holding of Blakely to the guidelines.
 
 A. Blakely
 1. Determinate Sentencing in Washington State
 
 113
 All felonies in Washington State are legislatively classified as either A, B, or C felonies. See Wash. Rev.Code § 9A.20.010(b) (Westlaw 2004). For crimes committed after July 1, 1984, Washington statutory law provides a maximum term of imprisonment of life for Class A felonies, a maximum sentence of ten years for Class B felonies, and a maximum sentence of five years for Class C felonies. See id. § 9A.20.021(1) (Westlaw 2004).
 
 
 114
 In addition to the maximum penalties specified in the felony classification statutes, the Washington State Sentencing Reform Act of 1981 created a second level of statutory sentencing. Under this system, each criminal offense is characterized according to its seriousness level, ranging from Level I for relatively minor offenses such as "malicious mischief 2" up to Level XVI for "aggravated murder 1." Wash. Rev.Code § 9.94A.515 (Westlaw 2004). Also, every convicted criminal defendant is assigned an offender score based largely on the defendant's prior criminal history. See id. § 9.94A.525 (Westlaw 2004). The statute also sets forth a sentencing grid that prescribes a minimum and maximum sentence based on the offense seriousness level and the offender score. See id. § 9.94A.510 (Westlaw 2004).[15]
 
 
 115
 The trial court must sentence the defendant within this statutory sentencing range unless "there are substantial and compelling reasons justifying an exceptional sentence" above or below the prescribed range. Id. § 9.94A.535 ¶ 1 (Westlaw 2004). Factual findings underlying an exceptional sentence are to be made by the court, employing a preponderance-of-the-evidence standard. See Wash. Rev.Code § 9.94A.530(2) (Westlaw 2004).
 
 
 116
 The calculations underlying the selection of the sentencing range are reviewable on appeal, but the choice of a particular sentence within the statutory range is not. See State v. McCorkle, 137 Wash.2d 490, 973 P.2d 461, 462 (1999) (en banc). However, on appeal from an exceptional sentence the reviewing court will assess the validity of, and the factual support for, the departure and will consider whether the sentence imposed is excessive. See State v. Halgren, 137 Wash.2d 340, 971 P.2d 512, 514-15 (1999) (en banc).
 
 
 117
 The Washington guidelines are legislatively determined. Washington State does have a sentencing guidelines commission, but its role is wholly advisory — the legislature has never delegated its authority to set sentencing policy. See Wash. Rev. Code § 9.94A.850(2)(a)-(c) (Westlaw 2004); David Boerner & Roxanne Lieb, Sentencing Reform in the Other Washington, 28 Crime & Just. 71, 83-85 (2001) (noting that "the Washington commission's role was advisory from the beginning" and that "[t]he legislature retained its authority over sentencing, with the guidelines commission serving in an advisory capacity"); State of Wash. Sentencing Guidelines Comm'n, Powers and Duties of the Commission, at http://www.sgc.wa.gov/powersandduties.htm (last visited Aug. 25, 2004) (stating that the statutory mandate of the commission is limited to "[e]valuating and monitoring adult and juvenile sentencing policies and practices and recommending modifications to the Governor and the Legislature" and "[s]erving as a clearinghouse and information center on adult and juvenile sentencing").
 
 2. The Decision in Blakely
 
 118
 In October 1998, Ralph Howard Blakely, Jr. accosted his wife at their home, binding her with duct tape and forcing her at knife point to climb into a "coffin-like plywood box" in the bed of his pickup truck. State v. Blakely, 111 Wash.App. 851, 47 P.3d 149, 152 (2002). As he did so, he importuned her to dismiss the divorce suit and trust proceedings she had instituted against him. After the couple's son, Ralphy, arrived at the home, Blakely drove away with his wife in the back of the truck. Blakely forced 13-year-old Ralphy to follow in Mrs. Blakely's car, threatening to harm Ralphy's mother if he did not comply. Ralphy escaped when the family stopped at a gas station; Blakely continued with his wife to a friend's house in Montana. The friend subsequently called the police, and Blakely was arrested without incident.
 
 
 119
 Blakely pleaded guilty to one count of second degree domestic violence kidnapping and one count of second degree domestic violence assault. Under the felony classification system, second degree kidnapping (committed without a sexual motivation) is a Class B felony subject to a maximum penalty of ten years. See Wash. Rev.Code § 9A.40.030(3)(a) (Westlaw 2004). Under the Sentencing Reform Act, second degree kidnapping is a level V offense; this level, combined with Blakely's offender score, resulted in a statutory sentencing range of 49-53 months. Thus, according to Washington State law, the statutory maximum sentence was 53 months. The prosecution recommended that Blakely be sentenced at or near the maximum. Instead, the trial court imposed an exceptional sentence of 90 months based on its finding that Blakely had acted with deliberate cruelty and that he had committed domestic violence in front of his son. See Wash. Rev.Code § 9.94A.535(2)(a), (2)(h)(ii) (Westlaw 2004).
 
 
 120
 After the state court of appeals affirmed and the state supreme court denied discretionary review, the United States Supreme Court granted certiorari and reversed, holding that the exceptional sentence violated the constitutional principles articulated in Apprendi. See Blakely, ___ U.S. at ___-___, 124 S.Ct. at 2536-38. The Court began by noting the precise manner in which the sentencing scheme at issue in Apprendi had offended the Constitution: "the judge had imposed a sentence greater than the maximum he could have imposed under state law without the challenged factual finding." Id. at 2537. The Court found the same defect in Blakely's sentence, noting that the trial court imposed an exceptional sentence because Blakely had acted with deliberate cruelty — a fact not admitted by Blakely in connection with his plea.
 
 
 121
 The Court rejected the State's claim that there was no Apprendi problem because even the exceptional sentence was within the ten-year maximum applicable to Class B felonies:
 
 
 122
 Our precedents make clear ... that the "statutory maximum" for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant. In other words, the relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings.
 
 
 123
 Id. (citations omitted). The Court concluded that this "statutory maximum" was 53 months, the top of the statutory sentencing range, because the sentencing judge could not exceed that maximum without making additional factual findings. See id. at 2538 ("Had the judge imposed the 90-month sentence solely on the basis of the plea, he would have been reversed."). Therefore, the Court ruled, "[t]he `maximum sentence' is no more 10 years here than it was 20 years in Apprendi (because that is what the judge could have imposed upon finding a hate crime) or death in Ring [v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002)] (because that is what the judge could have imposed upon finding an aggravator)." Id. The Court also rejected as "immaterial" the State's assertion that the sentence did not run afoul of Apprendi because the list of aggravating factors in the state sentencing guidelines is illustrative rather than exhaustive: "Whether the judge's authority to impose an enhanced sentence depends on finding a specified fact (as in Apprendi), one of several specified facts (as in Ring), or any aggravating fact (as here), it remains the case that the jury's verdict alone does not authorize the sentence." Id.
 
 B. Application of Blakely to the Guidelines
 
 124
 Shortly after Apprendi was decided, we held that it did not affect the sentencing guidelines. See United States v. Kinter, 235 F.3d 192, 198-202 (4th Cir. 2000). While we acknowledged that the argument for applying Apprendi to the guidelines was "not without support," id. at 200, we ultimately concluded that the claim failed in light of the quintessentially judicial nature of the tasks performed by the Sentencing Commission, see id. at 201 ("[T]he Commission's act of establishing sentencing ranges in the Guidelines is categorically different from the legislative act of setting a maximum penalty in a substantive criminal statute."); id. ("The Sentencing Guidelines do not create crimes. They merely guide the discretion of district courts in determining sentences within a legislatively-determined range ...."). We now re-examine this question in light of Blakely.
 
 
 125
 Blakely did not change — indeed, it reaffirmed — the question we must ask in determining whether application of the federal sentencing guidelines is subject to the rule of Apprendi: When a defendant is to be sentenced pursuant to the guidelines, what is the "prescribed statutory maximum"? After Apprendi but before Blakely, this and the other circuit courts of appeals had unanimously concluded that the maximum the defendant could receive "if punished according to the facts reflected in the jury verdict alone," Apprendi, 530 U.S. at 483, 120 S.Ct. 2348, was the maximum penalty provided in the statute setting forth the offense of conviction (or whatever penalty statute was referenced by the statute setting forth the offense of conviction), not the top of the guideline sentencing range mandated by those facts. See United States v. Reyes-Echevarría, 345 F.3d 1, 6-7 (1st Cir.2003); United States v. Garcia, 240 F.3d 180, 182-84 (2d Cir.2001); United States v. Williams, 235 F.3d 858, 862-63 (3d Cir.2000); United States v. Doggett, 230 F.3d 160, 166 (5th Cir.2000); United States v. Lawrence, 308 F.3d 623, 634-35 (6th Cir.2002); United States v. Knox, 301 F.3d 616, 620 (7th Cir.2002); United States v. Walker, 324 F.3d 1032, 1041 (8th Cir.), cert. denied, ___ U.S. ___, 124 S.Ct. 247, 157 L.Ed.2d 178 (2003); United States v. Ochoa, 311 F.3d 1133, 1135-36 (9th Cir.2002); United States v. Jackson, 240 F.3d 1245, 1249 (10th Cir.2001); United States v. Harris, 244 F.3d 828, 829-30 (11th Cir.2001); United States v. Fields, 251 F.3d 1041, 1043-44 (D.C.Cir.2001).
 
 
 126
 Blakely not only did not change the inquiry we must make, it also adhered to the rule the Court had announced in Apprendi: "`Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.'" Blakely, ___ U.S. at ___, 124 S.Ct. at 2536 (quoting Apprendi, 530 U.S. at 490, 120 S.Ct. 2348, and explaining that "[t]his case requires us to apply the rule we expressed in Apprendi" (emphasis added)). Therefore, in view of the fact that Blakely changed neither the question nor the rule for answering the question, we must determine what it is in Blakely that has prompted some courts to abandon the previously held view that the rule of Apprendi does not affect the guidelines.
 
 
 127
 We think the most likely culprit is the broad language found in parts of Blakely, particularly the following passage:
 
 
 128
 Our precedents make clear ... that the "statutory maximum" for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant. See Ring, supra, at 602, 122 S.Ct. 2428 ("`the maximum he would receive if punished according to the facts reflected in the jury verdict alone'" (quoting Apprendi, supra, at 483, 120 S.Ct. 2348)); Harris v. United States, 536 U.S. 545, 563, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002) (plurality opinion) (same); cf. Apprendi, supra, at 488, 120 S.Ct. 2348 (facts admitted by the defendant). In other words, the relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts "which the law makes essential to the punishment," Bishop, supra, § 87, at 55, and the judge exceeds his proper authority.
 
 
 129
 Blakely, ___ U.S. at ___, 124 S.Ct. at 2537 (parallel citations omitted).
 
 
 130
 In light of this language, it is hardly surprising that several courts have held that Blakely signals the demise of the guidelines. See, e.g., Booker, 375 F.3d at 511. Viewing the above-quoted passage alone, and noting the quotation marks surrounding the term "statutory maximum," it is not that farfetched to conclude that the Court intended to encompass within its holding any situation in which a binding maximum — whether statutory or not — is increased by virtue of a judicial finding. Indeed, Justices O'Connor and Breyer expressed concern that the decision in Blakely necessarily implied the invalidity of important aspects of the federal guidelines system. See Blakely, ___ U.S. at ___, 124 S.Ct. at 2550 (O'Connor, J., dissenting) ("If the Washington scheme does not comport with the Constitution, it is hard to imagine a guidelines scheme that would."); id. at 2561 (Breyer, J., dissenting) ("Until now, I would have thought the Court might have limited Apprendi so that its underlying principle would not undo sentencing reform efforts. Today's case dispels that illusion.... Perhaps the Court will distinguish the Federal Sentencing Guidelines, but I am uncertain how.").
 
 
 131
 We think that those courts which have held that the Blakely Court redefined the term "statutory maximum," see Booker, 375 F.3d at 514, have failed to account for the factual and legal context in which Blakely was decided. Under Apprendi, a jury verdict or plea of guilty authorizes the sentencing judge to impose a sentence up to the legislatively prescribed maximum specified in the statute that sets forth the offense of conviction. See Apprendi, 530 U.S. at 482, 120 S.Ct. 2348 (noting that "the judge's task in sentencing is to determine, within fixed statutory or constitutional limits, the type and extent of punishment after the issue of guilt has been resolved" (alteration & internal quotation marks omitted)). Blakely required the Court to apply this principle to a sentencing scheme involving two legislatively prescribed statutory maximum penalties. See Blakely, ___ U.S. at ___, 124 S.Ct. at 2537 (describing the top of the sentencing range under the Washington State Sentencing Reform Act as a "statutory maximum"); Booker, 375 F.3d at 518 (Easterbrook, Circuit Judge, dissenting) ("Blakely arose from a need to designate one of two statutes as the `statutory maximum'.").
 
 
 132
 This understanding of Blakely is consistent with Apprendi, in which the Court repeatedly used language indicating that jury protections come into play when legislatively prescribed penalties are at issue.[16] See Apprendi, 530 U.S. at 481, 120 S.Ct. 2348 (noting history of judicial discretion to sentence "within the range prescribed by statute" (emphasis omitted)); id. (observing that "our periodic recognition of judges' broad discretion in sentencing ... has been regularly accompanied by the qualification that that discretion was bound by the range of sentencing options prescribed by the legislature" (emphasis added)); id. at 484, 120 S.Ct. 2348 (noting heightened stigma that attaches when a defendant "faces punishment beyond that provided by statute" (emphasis added)); id. at 487 n. 13, 120 S.Ct. 2348 (limiting McMillan "to cases that do not involve the imposition of a sentence more severe than the statutory maximum for the offense established by the jury's verdict" (emphasis added)); id. at 490, 120 S.Ct. 2348 ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (emphasis added)). There is no reason to believe that this explicit linking of Sixth Amendment rights to legislatively prescribed penalties was ill-considered or accidental. Cf. Booker, 375 F.3d at 518 (Easterbrook, Circuit Judge, dissenting) ("Why did the Justices deploy that phrase [`statutory maximum'] in Apprendi and repeat it in Blakely (and quite a few other decisions)? Just to get a chuckle at the expense of other judges who took them seriously and thought that `statutory maximum' might have something to do with statutes? Why write `statutory maximum' if you mean `all circumstances that go into ascertaining the proper sentence'?").
 
 
 133
 Our understanding of Blakely also comports with the prior guidelines decisions of the Supreme Court. The Court has upheld guidelines sentencing against every constitutional challenge thus far brought before it; a holding that Blakely renders important aspects of guidelines sentencing unconstitutional would undermine, if not outright nullify, several of these decisions.[17]
 
 
 134
 We begin with Mistretta v. United States, 488 U.S. 361, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989), in which the Supreme Court upheld the constitutionality of the guidelines against nondelegation and separation of powers challenges. Characterizing the guidelines as "Congress' considered scheme for resolving the seemingly intractable dilemma of excessive disparity in criminal sentencing," id. at 384, 109 S.Ct. 647, the Court concluded that Congress' establishment of the Sentencing Commission did not violate separation of powers principles, see id. at 380-411, 109 S.Ct. 647. Of particular relevance here, the Court noted that
 
 
 135
 Although the Guidelines are intended to have substantive effects on public behavior..., they do not bind or regulate the primary conduct of the public or vest in the Judicial Branch the legislative responsibility for establishing minimum and maximum penalties for every crime. They do no more than fetter the discretion of sentencing judges to do what they have done for generations — impose sentences within the broad limits established by Congress.
 
 
 136
 Id. at 396, 109 S.Ct. 647 (emphasis added). Mistretta thus makes clear that the guidelines do collectively what federal district judges previously did individually — select a sentence within the range of penalties specified by Congress. See Kinter, 235 F.3d at 201 ("[T]he Commission's act of establishing sentencing ranges in the Guidelines is categorically different from the legislative act of setting a maximum penalty in a substantive criminal statute.").
 
 
 137
 In short, the Mistretta Court rejected a constitutional challenge to the guidelines on the basis that the Sentencing Commission performs not a legislative function, but a judicial one. Application of Blakely to the guidelines, however, necessarily would require a conclusion that the Sentencing Commission performs not a judicial function, but a legislative one. This is so because Blakely applies to the guidelines only if the Blakely Court redefined the term "statutory maximum" to include any fact that increases a defendant's potential sentence — regardless of its status as a statute or regulation and regardless of its provenance. Under such a definition of "statutory maximum," the Commission performs a legislative function in contravention of Mistretta.[18]
 
 
 138
 A similar problem appears when we consider other Supreme Court decisions addressing the guidelines. One such case is Edwards v. United States, 523 U.S. 511, 118 S.Ct. 1475, 140 L.Ed.2d 703 (1998). The Edwards defendants were charged with a drug-trafficking conspiracy involving cocaine and cocaine base ("crack"). See id. at 512-13, 118 S.Ct. 1475. The district court instructed the jury that it must find that the defendants' conduct involved crack or cocaine, and the jury returned a general verdict of guilty. See id. at 513, 118 S.Ct. 1475. The court then determined that the defendants' relevant conduct involved both forms of cocaine and premised its guidelines computations on this finding. See id. A unanimous Supreme Court upheld these computations, noting that "[t]he Sentencing Guidelines instruct the judge in a case like this one to determine both the amount and the kind of controlled substances for which a defendant should be held accountable." Id. at 513-14, 118 S.Ct. 1475 (internal quotation marks omitted).
 
 
 139
 The Court rejected the defendants' claim that the district court was required by the Constitution or the relevant statute to presume that the jury found that the conspiracy involved only cocaine, reasoning that such a presumption would have little effect because the district court would still be required to impose a sentence based on all relevant conduct, including conduct found by the judge but not the jury. See id. at 514, 118 S.Ct. 1475. The Court added, "[P]etitioners' statutory and constitutional claims would make a difference if it were possible to argue, say, that the sentences imposed exceeded the maximum that the statutes permit for a cocaine-only conspiracy." Id. at 515, 118 S.Ct. 1475. This was not the case, however, because "the sentences imposed ... were within the statutory limits applicable to a cocaine-only conspiracy." Id.
 
 
 140
 In short, the Court concluded in Edwards that the district court was required by the guidelines to go beyond the "facts found by the jury" and determine for itself the type and quantity of drugs involved in the offense, and it rejected any possible constitutional challenge to this scheme precisely because the sentence imposed — based, as it was, on judicial findings of fact — was not more than the legislatively prescribed statutory maximum authorized by the finding of guilt by the jury. Edwards is entirely consistent with the rule adopted in Apprendi, which requires a jury finding for facts that establish the maximum potential statutory penalty. See Apprendi, 530 U.S. at 487, 120 S.Ct. 2348 n.13 (explaining that Apprendi rule applies to "the imposition of a sentence more severe than the statutory maximum for the offense established by the jury's verdict"). Edwards is also consistent with our understanding of Blakely, i.e., that in Blakely the Court simply applied the rule of Apprendi to a new set of facts. If one understands Blakely as having broadened the definition of "statutory maximum," however, Edwards is no more. Under a supposed Blakely "redefinition" of statutory maximum, the Court could not have brushed aside the constitutional question presented in Edwards simply by stating that the findings made by the district court did not cause the sentence to exceed "the maximum that the statutes permit for a cocaine-only conspiracy." Edwards, 523 U.S. at 515, 118 S.Ct. 1475. To the contrary, under the asserted Blakely redefinition of "statutory maximum," the Edwards Court would have faced a substantial constitutional question because the findings made by the district court regarding drug type and quantity would have increased the statutory maximum, thereby creating a right to jury findings on those questions.
 
 
 141
 We must also be mindful of the effect of an incorrect reading of Blakely on United States v. Watts, 519 U.S. 148, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997) (per curiam). In Watts, the Supreme Court thought it so obvious that judges could consider acquitted conduct in sentencing a defendant under the guidelines, see id. at 157, 117 S.Ct. 633, that the case was decided without oral argument despite Watts' claim that such a rule posed constitutional problems under the Double Jeopardy Clause, the Due Process Clause, and the Sixth Amendment, see Respondent Watts' Brief in Opposition, United States v. Watts, 519 U.S. 148, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997) (No. 95-1906), 1996 WL 33413758, at *9-*13.
 
 
 142
 The sentence challenged in Watts was based in part on acquitted conduct, i.e., factual allegations that the jury determined had not been proven beyond a reasonable doubt. The Court nevertheless upheld this sentence, noting the lower standard of proof applicable to sentencing proceedings and reiterating its previous holding that "application of the preponderance standard at sentencing generally satisfies due process." Watts, 519 U.S. at 156, 117 S.Ct. 633 (citing McMillan v. Pennsylvania, 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986)). If Blakely redefined the term "statutory maximum," however, consideration of acquitted conduct in establishing the guideline range would violate the Due Process Clause precisely because of the lower standard of proof.
 
 
 143
 In summary, we conclude that the fundamental question under Apprendi and Blakely is not simply whether judicial fact finding increases a defendant's sentence relative to the sentence that would otherwise be imposed. Such a reading of these cases fails to take into account the context in which they were decided — a context which included the prior statements of the Supreme Court regarding the federal sentencing guidelines and Congress' intent in enacting the Sentencing Reform Act — and thus misapprehends the rule they impose. In fact, the pertinent question is whether a judicial factual finding has increased the defendant's sentence beyond what the legislature has authorized as the consequence of a conviction or guilty plea. There is thus a very real difference between federal statutes (which define crimes and set forth statutory penalty ranges, a legislative function) and the federal sentencing guidelines (which channel judicial discretion in selecting a penalty within the range authorized by Congress, a judicial function). We therefore conclude that Blakely, like Apprendi before it, does not affect the operation of the federal sentencing guidelines.
 
 C. Instructions to the District Courts
 
 144
 We previously instructed district courts within the Fourth Circuit to continue sentencing defendants in accordance with the guidelines, as was the practice before Blakely. See Hammoud, 378 F.3d 426, 2004 WL 1730309, at *1. We further recommended that those courts announce, at the time of sentencing, a sentence pursuant to 18 U.S.C.A. § 3553(a) (West 2000 & Supp.2004), treating the guidelines as advisory only.
 
 
 145
 We believe that announcing — not imposing — a non-guidelines sentence at the time of sentencing will serve judicial economy in the event that the Supreme Court concludes that Blakely significantly impacts guidelines sentencing.[19] The announcement of a non-guidelines sentence may require the district court to consider issues not generally pertinent in guidelines sentencing, thereby requiring the investment of additional time at the sentencing hearing. If the Supreme Court does not apply Blakely to the guidelines, this will be wasted effort. If the Court does apply Blakely to the guidelines, however, the district court and the parties will have made at least substantial progress toward the determination of a non-guidelines sentence, at a time when the facts and circumstances were clearly in mind. While a new hearing may have to be convened in order to impose the previously determined and announced non-guidelines sentence, we anticipate that the district court and the parties will need to spend far less time preparing because the issues will already have been resolved. We therefore continue to recommend that district courts within the Fourth Circuit announce, at the time of imposing a guidelines sentence, a sentence pursuant to 18 U.S.C.A. § 3553(a), treating the guidelines as advisory only.
 
 VIII. Sentencing Issues
 
 146
 Having determined that Blakely does not affect Hammoud's sentence, we now consider the remainder of his challenges to his sentence. Hammoud challenges several rulings made by the district court during sentencing. The most significant of these claims concerns the application of the terrorism enhancement, see U.S.S.G. § 3A1.4. Hammoud's remaining sentencing claims may be disposed of more briefly.
 
 A. Terrorism Enhancement
 
 147
 Section 3A1.4 applies "[i]f the offense is a felony that involved, or was intended to promote, a federal crime of terrorism." The term "federal crime of terrorism" is defined as commission of an enumerated felony — including providing material support to a designated FTO in violation of 18 U.S.C.A. § 2339B — that "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C.A. § 2332b(g)(5) (West 2000 & Supp.2004); see U.S.S.G. § 3A1.4, comment. (n.1).
 
 1. Standard of Proof
 
 148
 Hammoud argues that the preponderance standard that generally governs in sentencing proceedings should not apply here because § 3A1.4 is "a tail which wags the dog of the substantive offense," McMillan v. Pennsylvania, 477 U.S. 79, 88, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986), and therefore must be proved at least by clear and convincing evidence. Because Hammoud did not raise this claim in the district court (he instead asserted that the facts underlying the enhancement had to be found by a jury beyond a reasonable doubt under Apprendi), we review for plain error. As noted previously, the plain error standard requires Hammoud to demonstrate that there was error that was plain and affected his substantial rights; we must then determine that the exercise of our discretion to correct the error is necessary to protect the integrity of judicial proceedings. For the reasons set forth below, we conclude that any error was not plain.
 
 
 149
 In McMillan, the Supreme Court noted that due process is generally satisfied when sentencing factors are proved by a preponderance of the evidence; the Court rejected a claim that a factor requiring imposition of a mandatory minimum sentence should be subject to a higher standard of proof. See id. at 91-92, 106 S.Ct. 2411. In reaching this conclusion, the court noted that the statutory mandatory minimum at issue there — for visible possession of a firearm — "operates solely to limit the sentencing court's discretion in selecting a penalty within the range already available to it without the special finding of visible possession" and that "[t]he statute gives no impression of having been tailored to permit the visible possession finding to be a tail which wags the dog of the substantive offense." Id. at 88, 106 S.Ct. 2411.
 
 
 150
 While this court has taken the language of McMillan as an indication that the Due Process Clause imposes some limitations on the use of sentencing factors proven only by a preponderance of the evidence, we have never defined those limits and have never declared a sentence invalid on the basis that a sentencing factor was established by an inadequate standard of proof. See, e.g., United States v. Montgomery, 262 F.3d 233, 249-50 (4th Cir. 2001) (stating that "[p]roof by a preponderance of evidence is sufficient as long as the enhancement is not a tail that wags the dog of the substantive offense"; not deciding whether the district court was required to apply a heightened standard, as it had made the relevant finding by clear and convincing evidence "[i]n an abundance of caution" (internal quotation marks omitted)); United States v. Fenner, 147 F.3d 360, 366-67 (4th Cir.1998) (stating that "sometimes the prosecution must bear the burden of proving beyond a reasonable doubt facts bearing upon sentencing" but noting that such circumstances had not been defined).
 
 
 151
 The Sixth Circuit has held — in a case involving the § 3A1.4 enhancement — that it is never necessary to apply a heightened standard of proof to a sentencing factor. See United States v. Graham, 275 F.3d 490, 517 n. 19 (6th Cir.2001). The court reasoned that
 
 
 152
 The McMillan Court's apparent concern was not whether the sentencing factor's effect on the ultimate sentence was significant, but whether it was appropriately characterized as guiding the court's discretion in punishing the defendant for the crime for which he was convicted. As long as a sentencing factor does not alter the statutory range of penalties faced by the defendant for the crime of which he was convicted, McMillan permits the factor to be found by preponderance of the evidence.
 
 
 153
 Id. In contrast, the Ninth Circuit has imposed a heightened standard of proof in a number of cases. See, e.g., United States v. Jordan, 256 F.3d 922, 927-28 (9th Cir. 2001) (noting that court has applied heightened standard of proof for seven-level and nine-level enhancements and articulating "totality of the circumstances" test for determining whether heightened standard should apply (internal quotation marks omitted)). And, the Third Circuit has required application of the clear and convincing standard to factual findings underlying an upward departure that increased the defendant's sentence from 30 months to 30 years. See United States v. Kikumura, 918 F.2d 1084, 1100-1102 (3d Cir.1990).
 
 
 154
 In the absence of a binding decision from this court or the Supreme Court, and in view of the conflicting views of the other circuits, we conclude that any error in the standard of proof applied by the district court was not plain. See United States v. Neal, 101 F.3d 993, 998 (4th Cir.1996).
 
 2. Application of the Enhancement
 
 155
 Hammoud raises two additional arguments regarding the terrorism enhancement. First, Hammoud contends that the district court should have applied U.S.S.G. § 2M5.3 — the guideline specifically applicable to violations of § 2339B — rather than § 3A1.4. Even assuming that the district court should have applied § 2M5.3,[20] there was no error.
 
 
 156
 Setting § 2M5.3 aside for the moment, it is clear that the terrorism enhancement may be imposed on a defendant who has been convicted of providing material support to a designated FTO. Section 3A1.4 applies "[i]f the offense is a felony that involved ... a federal crime of terrorism." Id. § 3A1.4(a). As the Sixth Circuit has noted, "[t]he word `involved' occurs frequently throughout the Guidelines, both in the substantive provisions and in the commentary, and is typically employed to mean `included.'" Graham, 275 F.3d at 516. We therefore think it is reasonable to understand § 3A1.4 as applying to a circumstance such as this one, in which one of the counts of conviction is alleged to be a federal crime of terrorism. See id. (concluding that § 3A1.4 applies when the defendant has committed a federal crime of terrorism). Violation of § 2339B is one of the crimes enumerated in the definition of "federal crime of terrorism." Therefore — still setting § 2M5.3 aside momentarily — a defendant who has been convicted of providing material support to an FTO may be subject to the enhancement if the evidence establishes that he provided such support with the intent to influence or coerce government conduct.
 
 
 157
 Having determined that the terrorism enhancement would apply to Hammoud if § 2M5.3 did not exist, we now turn to the question of whether the existence of § 2M5.3 changes our analysis. We conclude that it does not. As best we can discern from his rather conclusory argument, Hammoud's concern is that application of both § 2M5.3 and § 3A1.4 would constitute double counting, and therefore a district court could apply one or the other, but not both. We disagree.
 
 
 158
 Double counting under the guidelines occurs "when a provision of the Guidelines is applied to increase punishment on the basis of a consideration that has been accounted for by application of another Guideline provision." United States v. Reevey, 364 F.3d 151, 158 (4th Cir.2004). Double counting is permissible unless the guidelines expressly prohibit it in a given circumstance. See id. Thus, "[a]n adjustment that clearly applies to the conduct of an offense must be imposed unless the Guidelines expressly exclude its applicability." United States v. Williams, 954 F.2d 204, 207 (4th Cir.1992). Nothing in either § 2M5.3 or in § 3A1.4 prohibits the application of both provisions. Hammoud's double counting claim therefore fails.
 
 
 159
 Hammoud also maintains that the evidence does not support application of the terrorism enhancement. We disagree. The evidence presented at trial established that Hammoud had close connections with Hizballah officials, including its spiritual leader and a senior military commander. Other evidence — including Hammoud's own testimony — indicated that Hammoud was well aware of Hizballah's terrorist activities and goals and that he personally supported this aspect of Hizballah. In short, the evidence presented at trial was sufficient to establish that Hammoud provided material support to Hizballah with the intent to influence or coerce government conduct.
 
 B. Sophisticated Money Laundering
 
 160
 The money laundering guideline provides for a two-level enhancement if the defendant is convicted of violating 18 U.S.C.A. § 1956 and "the offense involved sophisticated money laundering." U.S.S.G. § 2S1.1(b)(3). The commentary provides that "`sophisticated laundering' means complex or intricate offense conduct pertaining to the execution or concealment" of the offense, and "typically involves the use of" fictitious entities, shell corporations, "layering" of transactions, or offshore accounts. Id. § 2S1.1, comment. (n.5(A)).
 
 
 161
 Here, the district court found that Hammoud and his coconspirators employed fictitious entities and shell corporations in the course of laundering the proceeds from the cigarette smuggling operation. This finding is not clearly erroneous, and therefore the enhancement was properly applied.
 
 C. Obstruction of Justice
 
 162
 Finally, Hammoud challenges application of an enhancement for obstruction of justice, see U.S.S.G. § 3C1.1, that was based upon his testimony at trial. An obstruction of justice enhancement based on perjured trial testimony is proper when "the defendant ... (1) gave false testimony; (2) concerning a material matter; (3) with the willful intent to deceive (rather than as a result of confusion, mistake, or faulty memory)." United States v. Quinn, 359 F.3d 666, 681 (4th Cir.2004) (internal quotation marks omitted). Here, count 78 charged Hammoud with giving $3,500 to Hizballah; as part of its case, the Government introduced into evidence the receipt for this donation. Hammoud, however, denied ever having donated any money to Hizballah. Under these circumstances, application of the enhancement was not clear error.
 
 IX. Conclusion
 
 163
 For the reasons set forth above, we reject each of Hammoud's challenges to his convictions and sentence. We therefore affirm the judgment of the district court in its entirety.
 
 
 AFFIRMED
 
 
 
 Notes:
 
 
 [1]
 The definition of "material support" was amended in 2001See 18 U.S.C.A. § 2339A(b) (West Supp.2004). We rely on the definition in effect at the time of the offenses.
 
 
 [2]
 Hammoud's challenges to the constitutionality of § 2339B are supported by an amicus brief filed by a coalition of civil rights groups
 
 
 [3]
 Hammoud relies in part on cases holding that a donation to a political advocacy group is a proxy for speechSee, e.g., Buckley v. Valeo, 424 U.S. 1, 16-17, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam). Hizballah is not a political advocacy group, however. Therefore, while providing monetary support to Hizballah may have an expressive component, it is not the equivalent of pure political speech. See Humanitarian Law Project v. Reno, 205 F.3d 1130, 1134-35 (9th Cir.2000) (rejecting argument that material support prohibition is subject to strict scrutiny review under Buckley and similar cases).
 
 
 [4]
 A defendant who is prosecuted because his protected speech is incidentally covered by a broader ban on unprotected activity may bring an as-applied challenge. Hammoud is not such a defendant for the reasons previously articulated
 
 
 [5]
 On a related note, Hammoud argues that the designation of an organization as an FTO is a "fact" that increases the available penalty, and therefore must be found by the jury underApprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). Apprendi does not apply here, however, because the designation does not allow an increased penalty beyond that authorized by the elements of the offense (which, as noted in the text, do not include the validity of the FTO designation).
 
 
 [6]
 When the Government applied for a FISA warrant to conduct electronic surveillance of Hammoud, FISA required a certification that the acquisition of foreign intelligence information was "the purpose" of the surveillance. In 2001, Congress amended FISA to require a certification that the acquisition of foreign intelligence information is "a significant purpose" of the surveillanceSee Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (USA PATRIOT Act), Pub.L. No. 107-56, § 218, 115 Stat. 272, 291 (2001). For purposes of this appeal, we will assume that the higher standard imposed by the pre-USA PATRIOT Act version of FISA controls.
 
 
 [7]
 Hammoud suggests that the FBI should have abandoned the surveillance when it became clear that no foreign intelligence information would be obtained. Hammoud provides no argument supporting this claim, however, and we therefore do not consider itSee Fed. R.App. P. 28(a)(9)(A) (providing that the appellant's brief must contain "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies"); 11126 Baltimore Blvd., Inc. v. Prince George's County, 58 F.3d 988, 993 n. 7 (4th Cir.1995) (en banc) (declining to consider arguments for failure to comply with Rule 28).
 
 
 [8]
 When the Government filed its notice, the relevant provision was Rule 16(a)(1)(E). The rule was amended in 2002, and subsection (a)(1)(E) was relettered (a)(1)(G). There was no change in the text
 
 
 [9]
 The Government contends that it complied fully with Rule 16 because it kept Hammoud and the district court informed of its continuing efforts to secure an expert on Hizballah. This claim is not persuasive, however. The district court set a clear deadline for discovery, and there is no dispute that the deadline passed before the Government identified Levitt
 
 
 [10]
 The timeliness of the CIPA claim also provides a potential basis for rejection of Hammoud's claim. The CIPA issue was first raised by Chawki Hammoud in a motion filed during the course of trial (this motion was joined by Hammoud). Chawki Hammoud acknowledged that his motion was untimely under CIPA § 5(a) but asserted that the untimeliness resulted from the Government's failure to comply with its discovery obligations and therefore should be excused. In view of our conclusion that CIPA is not implicated here for other reasons, we do not address the timeliness of the CIPA claim
 
 
 [11]
 Hammoud also cites Rule 404(b), which prohibits—with certain exceptions —the admission of prior bad acts that are extrinsic to the crime charged in order "to prove the character of a person in order to show action in conformity therewith." Fed.R.Evid. 404(b);see United States v. Higgs, 353 F.3d 281, 311 (4th Cir.2003), petition for cert. filed, No. 03-10498 (U.S. May 21, 2004). Rule 404(b) is simply not relevant here. To the extent the "bad act" is the playing of the videotapes during Thursday night prayer meetings, it was intrinsic to the charged crime of providing material support to Hizballah. To the extent the "bad act" was the activities depicted in the videotapes, none of the tapes depicted actions by Hammoud, and the character of the people depicted in the tapes was not at issue.
 
 
 [12]
 Hammoud notes that he offered to stipulate that the tapes were found in his home and that they were produced by Hizballah. Even if such a stipulation had been accepted, however, it still would not relieve the Government of the burden of demonstrating that Hammoud knew that Hizballah engaged in terrorist activitySee United States v. Hill, 249 F.3d 707, 712 (8th Cir.2001) (noting that the defendant's offer to stipulate to the element of intent did not alleviate the Government's obligation to prove intent).
 Hammoud also suggests that the district court was required to accept his stipulation under Old Chief v. United States, 519 U.S. 172, 174, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997), in which the Supreme Court held that in a prosecution for being a felon in possession of a firearm, a defendant must be allowed to stipulate to his status as a felon. Old Chief does not mandate the acceptance of all offered stipulations, however. The Court noted that its ruling was an exception to the general rule that "the prosecution is entitled to prove its case by evidence of its own choice, or, more exactly, that a criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the Government chooses to present it." Id. at 186-87, 117 S.Ct. 644. We have limited Old Chief to its facts. See Grimmond, 137 F.3d at 833 n. 14. In any event, as noted above, the videotapes were admissible to prove facts beyond the scope of Hammoud's stipulation.
 
 
 [13]
 Counsel then argued that the Government had failed to prove the existence of a conspiracy in Charlotte
 
 
 [14]
 In the district court and on appeal, Hammoud argued that underApprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), the facts underlying the terrorism enhancement and the amount of tax loss should have been alleged in the indictment and found by the jury beyond a reasonable doubt. These claims are now subsumed by Hammoud's claim, articulated in his supplemental brief, that Blakely requires all facts that result in an increased offense level to be charged in the indictment and found by the jury beyond a reasonable doubt. We therefore do not address them separately.
 
 
 [15]
 Drug offenses are sentenced pursuant to a separate sentencing grid based on a three-level system of offense seriousnessSee id. §§ 9.94A.517-.518 (Westlaw 2004).
 
 
 [16]
 A proper reading ofBlakely also allows us to take the Court at its word when it stated that it was "apply[ing]" the rule of Apprendi, not modifying it.
 
 
 [17]
 United States v. Dunnigan, 507 U.S. 87, 92-96, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993), in which the Court held that the guidelines permit an obstruction of justice enhancement, see U.S.S.G. § 3C1.1, for perjury at trial, is not one of these cases. Dunnigan concerned primarily a question of guidelines construction, and so it is not irreconcilable with any reading of Blakely. However, it is worth noting that Dunnigan conflicts with Blakely in one respect. Justice O'Connor expressed concern in her Blakely dissent that extension of Apprendi to determinate sentencing systems would render such systems unworkable, in part because some facts — such as perjury at trial — cannot be discovered in time to be included in the indictment. See Blakely, ___ U.S. at ___, 124 S.Ct. at 2546 (O'Connor, J., dissenting). The majority disparaged this concern, stating, "Why perjury during trial should be grounds for a judicial sentence enhancement on the underlying offense, rather than an entirely separate offense to be found by a jury beyond a reasonable doubt (as it has been for centuries), is unclear." Id. at 2539 n. 11 (citation omitted). But, the Court had already answered that question in Dunnigan:
 [T]he enhancement is more than a mere surrogate for a perjury prosecution. It furthers legitimate sentencing goals relating to the principal crime, including the goals of retribution and incapacitation. It is rational for a sentencing authority to conclude that a defendant who commits a crime and then perjures herself in an unlawful attempt to avoid responsibility is more threatening to society and less deserving of leniency than a defendant who does not so defy the trial process.
 Dunnigan, 507 U.S. at 97, 113 S.Ct. 1111 (citations omitted).
 
 
 [18]
 In this vein, we note that Congress certainly did not view the function of the Sentencing Commission as a legislative one. The legislative history of the Sentencing Reform Act is clear that the function of the guidelines is to channel judicial discretion within the range of statutory penalties established by CongressSee, e.g., S.Rep. No. 98-225, at 51 (1983) ("The definition of maximum prison terms [under the Sentencing Reform Act] does not alter existing statutory maximums: the existing Federal statutes still determine the maximum terms of imprisonment."), reprinted in 1984 U.S.C.C.A.N. 3182, 3234.
 
 
 [19]
 At least one district court within our jurisdiction has indicated confusion about our recommendationSee United States v. Johnson, 333 F.Supp.2d 573, 575, 2004 WL 1968295 (S.D.W.Va. Aug.13, 2004). We emphasize that our recommendation is not intended to import uncertainty into the sentencing process through the imposition of multiple sentences. Under our prior order, district courts must impose a guidelines sentence which, absent a contrary direction from the Supreme Court, the defendant will serve. However, we cannot ignore the possibility that the Supreme Court will apply Blakely to the guidelines, and for the reasons stated in the text of this opinion, we believe it will serve the interests of judicial economy for a non-guidelines sentence to be determined at the time of the sentencing hearing.
 
 
 [20]
 Section 2M5.3 first appeared in the 2002 Guidelines Manual, after Hammoud committed his violations of § 2339B (which were completed in 2000). Because application of § 2M5.3 would have resulted in a higher base offense level, the district court arguably should have applied the 2000 version of the Guidelines ManualSee U.S.S.G. § 1B1.11(b)(1); Elliott v. United States, 332 F.3d 753, 767 n. 12 (4th Cir.2003).
 We note that the PSR indicates that the 2002 manual was applied. Hammoud does not challenge the application of the 2002 guidelines manual.
 
 
 
 164
 WILKINSON, Circuit Judge, concurring.
 
 
 165
 The United States Sentencing Guidelines are constitutional. To invalidate the Guidelines as presently applied, the federal judiciary would have to seize a sizable chunk of legislative territory. While I acknowledge the view that invalidation of the Guidelines would mark a great democratic development, I regard their evisceration as an unwarranted accretion of power by the federal courts.
 
 
 166
 The great drawback of applying Blakely v. Washington, ___ U.S. ___, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), to the Sentencing Guidelines is that in doing so the federal courts would perform a legislative function. It is and always has been the prerogative of the legislature to define the elements of a criminal offense. In denominating those sentencing factors which must now be treated as elements and found by a jury, the courts arrogate to themselves the most basic of legislative tasks. I do not think the judiciary can legislate the elements of a criminal offense without bending the Constitution beyond recognizable shape.
 
 
 167
 An element of a crime must be found by a jury as a precondition to guilt. It is what a jury must establish in order to convict a defendant of the charged offense. Sentencing factors are not elements. When a fact is not necessary for conviction of an offense — an offense passed into law by Congress — that fact becomes a "factor" because it cannot by definition be an "element." If the judiciary is now to announce that sentencing factors must be found as elements beyond a reasonable doubt, that badly skews the balance that Congress has historically been able to strike between guilt and punishment.
 
 
 168
 Of course, it will be said that if Blakely extends to the Guidelines, the judiciary is not in reality creating elements of new offenses, and juries in reality are simply finding facts as they have always done. This, however, ignores the substance of what is taking place. When a jury is required to find a fact beyond a reasonable doubt, it is fulfilling precisely the same function that the legislature historically has mandated for it in determining the guilt of a legislatively prescribed offense. And when the judiciary requires juries to do that which the legislature has historically had exclusive power to direct them to do, judges have assumed the lawmaker's role.
 
 
 169
 Pretending otherwise would draw us into a constitutional dilemma. If what the Supreme Court and Courts of Appeals have always understood to be factors are now understood to be elements, our problems are larger than we realize. Mistretta held that the Guidelines "do not bind or regulate the primary conduct of the public or vest in the Judicial Branch the legislative responsibility for establishing minimum and maximum penalties for every crime. They do no more than fetter the discretion of sentencing judges to do what they have done for generations — impose sentences within the broad limits established by Congress." Mistretta v. United States, 488 U.S. 361, 396, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989).
 
 
 170
 If, all along, the Sentencing Commission, in contravention of Mistretta, was actually creating elements, then it was also creating dozens and hundreds of new offenses. If the judiciary suddenly can say that juries must find all the facts that attach to these offenses, then judges have assigned themselves the enterprise of creating and defining crimes. But creating elements and defining offenses is a purely legislative power; offenses created within the judicial branch are void because they were not authorized by the law-making procedure our Constitution allows, that of Article I, Section 7. Installing judges, not Congress, as arbiters of the necessary elements of any given offense is hardly what the Sixth Amendment and the nature of our democracy allow, let alone demand.
 
 
 171
 Some may argue that separation of powers is not implicated because the power to create elements is a delegable function. I disagree. The power of legislatures to define crimes and to set ranges of punishment is no small thing. Criminal law is the basic bulwark of public safety in our country, and it makes sense that the formulation of offenses would be left in turn to the people's representatives. To apply Blakely to the Guidelines essentially severs the connection between public protection and popular governance. Put plainly, it erodes the legislature's constitutional prerogative to pass criminal laws to protect the American people.
 
 
 172
 Since Blakely, the air has been filled with anticipation of the invalidation of the Guidelines. There has been no shortage of suggestions for legislative "fixes" whereby Congress might reclaim its authority to define crimes and set parameters of punishment. Whether those new sentencing regimes would be more opaque or draconian than the present system is unclear. Whether any new regime would pass constitutional muster is itself uncertain. At a minimum, it will take more months of confusion and years of litigation to find out. The hard truth is that none of us can envision the future or forecast the shape of a post-Guidelines world.
 
 
 173
 We live, however, in a constitutional present. Congress has proclaimed, in the United States Code, what the elements of a crime are. It has instructed the courts to ensure through the Guidelines that the exercise of sentencing discretion is evenhanded, fair, non-discriminatory, and predictable. See Sentencing Reform Act of 1984, 28 U.S.C. § 991(b)(1)(B) (2000). What Congress — the most democratic of the branches — did not do was authorize the bench to create additional elements on its own. Nor could it, as Mistretta teaches. Yet some now maintain that the democratic features of jury deliberation require judges to start legislating and to push Congress aside.
 
 
 174
 I think such a result antithetical to our democracy, regardless of how it is spun. Contrary to the dissent's representations, I do not in any sense argue that Apprendi "got it wrong." Post at 368 n.4. To the contrary, I argue that invalidation of the Guidelines is in no sense required by Supreme Court precedent. Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and most recently Blakely, have not required the courts to legislate from the bench.* In each case, the Court held that any fact which increases a statutory maximum must be found by a jury. In each case, the Court keyed the analysis to the statutory maximum, thus operating explicitly within the framework that the legislature had imposed. But if any facts that increase a sentence without reference or regard to the statutory parameters must be found by a jury, then legislatures are no longer the creators of criminal law and judges no longer the instruments of guided sentencing discretion. The Apprendi line of cases sought to prevent judges from assuming the legislative prerogative; Hammoud now asks judges to assume that very same prerogative. To accept his invitation is to trample on the democratic foundations of our constitutional order.
 
 
 175
 Sixth Amendment rights are precious. Hammoud's were fully protected — a jury of his peers convicted him of no fewer than fourteen statutory offenses. But the particular Sixth Amendment right pressed after Blakely is novel and evolving; the democratic liberties at risk are ancient ones. The assignment to juries of all factual findings that may affect a sentence will doubtless be advertised as a great democratic development. In my judgment, it is profoundly anti-democratic because the least accountable branch has claimed for itself a power historically entrusted to the people's representatives. Because the opinion for the court refuses to assume powers that cannot be assumed, I am pleased to concur.
 
 
 
 Notes:
 
 
 *
 My good colleague in dissent says that "[t]he Supreme Court has spoken."Post at 360. More specifically, she argues that the question of whether courts are impermissibly creating legislative offense elements is foreclosed. To the contrary, this issue is at the center of the entire Guidelines debate.
 First, if the issue were foreclosed, why did the Supreme Court in Blakely take the trouble to state explicitly that its holding did not extend to the Guidelines? See Blakely, ___ U.S. at ___ n. 9, 124 S.Ct. at 2538 n. 9. The Court will not reach out to decide unpresented questions, but neither will it purposefully sow confusion by expressing agnosticism about a proposition not in doubt. Second, if the ability of courts to create offense elements is so plain, why has the Court not overruled Edwards v. United States, 523 U.S. 511, 118 S.Ct. 1475, 140 L.Ed.2d 703 (1998); United States v. Watts, 519 U.S. 148, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997) (per curiam); Witte v. United States, 515 U.S. 389, 115 S.Ct. 2199, 132 L.Ed.2d 351 (1995); or Stinson v. United States, 508 U.S. 36, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993)? In each case it allowed judges to find sentencing enhancements under the preponderance standard. Third, if the issue is foreclosed, why was the linchpin of the argument in Apprendi, Ring, and Blakely tied to the question of whether a fact caused a sentence to exceed the statutory maximum — an inquiry which by its nature respects the division of legislative and judicial authority? Finally, if this fundamental argument is so foreclosed, one is left to wonder how nine members of this court, unanimous panels of the Fifth and Eleventh Circuits, and the en banc Sixth Circuit, have found the Sentencing Guidelines constitutional in light of Blakely. See United States v. Reese, 382 F.3d 1308, 2004 WL 1946076 (11th Cir. Sept.2, 2004); United States v. Koch, 383 F.3d 436, 2004 WL 1899930 (6th Cir. Aug.26, 2004) (en banc); United States v. Pineiro, 377 F.3d 464 (5th Cir.2004). And if "controlling precedent" is so clear that failure to see it is "surprising," how much more surprising it must be that the Second Circuit, unanimously and en banc, certified the question to the Supreme Court, for the first time since 1981, because this was not an issue where "doctrinal uncertainty may be tolerated." United States v. Penaranda, 375 F.3d 238, 245 (2d. Cir.2004) (en banc). If the question of whether Blakely requires us to treat factors and elements the same was so clear, why has the Supreme Court expedited cases for argument on the first day of its Term to answer it?
 
 
 I
 do, however, appreciate that my colleague accepts my central critique of applyingBlakely to the Guidelines — namely that to do so is to convert factors into elements. See post at 368 n.4 ("treating `sentencing factors' that mandate enhancement of a sentence as `elements' is exactly what" precedent requires). My colleague neglects to mention any reason why such a course is justifiable.
 Whether the Sixth Amendment requires juries to find most sentence enhancing facts is integrally tied to the question of whether our constitutional structure reserves to legislatures alone the power to criminalize behavior. Indeed, the Sixth Amendment issue cannot be resolved without asking whether the creation of non-legislative elements commandeers the core constitutional function of a coordinate branch. Such judicial alchemy — converting legislative into judicial power — is not justifiable. Creating elements is what legislatures, and only legislatures, can do.
 
 
 
 176
 SHEDD, Circuit Judge, concurring.
 
 
 177
 I fully concur in Parts I-VI and VIII of the majority opinion. Concerning Part VII, the majority correctly frames the issue before us as "whether the rationale of Blakely (and Apprendi before it) requires indictment and a jury finding, beyond a reasonable doubt, of facts that result in an increase in the offense level and corresponding guideline range." Ante at 344-45. Blakely and Apprendi, of course, do not involve the constitutionality of the guidelines. As the majority points out, however, the Supreme Court has spoken on the constitutionality of the guidelines in differing contexts on several occasions, and it has consistently upheld the guidelines. Although "this line of authority by itself suggests that a lower court should be skeptical about concluding that Blakely's invalidation of a state-sentencing scheme suddenly dooms" the guidelines, United States v. Koch, 383 F.3d 436, 439, 2004 Fed.App. 0284P, 2004 WL 1899930, at *3 (6th Cir. Aug.26, 2004) (en banc), we would certainly be at liberty to apply the rationale of Blakely and Apprendi to the guidelines unless one of the Court's guidelines cases directly controls the issue presented to us.
 
 
 178
 I believe Edwards v. United States, 523 U.S. 511, 118 S.Ct. 1475, 140 L.Ed.2d 703 (1998), is that case. In Edwards, the Supreme Court was presented with, and necessarily rejected, a Sixth Amendment (among other issues) challenge to a sentencing enhancement based on judge-made factual findings. See Koch, 383 F.3d 436, 439, 2004 Fed.App. 0284P, 2004 WL 1899930 at *3-4; United States v. Booker, 375 F.3d 508, 516-17 (7th Cir.) (Easterbrook, J., dissenting), cert. granted, ___ U.S. ___, 125 S.Ct. 11, ___ L.Ed.2d ___, 73 U.S.L.W. 3073 (U.S. Aug. 2, 2004). As the Sixth Circuit noted, Edwards "gave the back of the hand to the kind of challenge raised here." Koch, at 439. Although Edwards predates Apprendi and Blakely, the Court gave no indication in either of those cases that Edwards is no longer valid. Indeed, the Court in Apprendi explicitly reaffirmed Edwards. See Apprendi, 530 U.S. at 497 n. 21, 120 S.Ct. 2348 ("The Guidelines are, of course, not before the Court. We therefore express no view on the subject beyond what this Court has already held. See, e.g., Edwards v. United States").*
 
 
 179
 In my opinion, because Edwards is controlling, the reasoning of Blakely, at most, creates a conflict with Edwards that may only be resolved by the Supreme Court. See Koch, at *4 ("The Court ... has not given us the authority to ignore Edwards"); Booker, 375 F.3d at 517 (Easterbrook, J. dissenting) ("It is for [the Court], not us, to say that as a result of Blakely" Edwards is no longer valid). Under these circumstances, our role as a court of appeals is simply to apply Edwards, and Edwards compels the conclusion that Hammoud's argument must fail. It is unnecessary for us to go further. For this reason, I concur in the result reached by the majority in Part VII.
 
 
 
 Notes:
 
 
 *
 Regardless of whether the United States shares my view ofEdwards, I believe that a close reading of that case compels the conclusion that it is controlling. I note that the United States Sentencing Commission, as amicus curiae in the Booker and Fanfan cases now pending before the Supreme Court, recognizes the import of Edwards. See Brief of United States Sentencing Commission at 25-26, United States v. Booker (No. 04-104) ("To conclude that factfinding under the guidelines violates the Sixth Amendment, the Court would have to . . . overrule or substantially limit Edwards").
 
 
 
 180
 WIDENER, Circuit Judge, concurring and dissenting.
 
 
 181
 I concur in the result and in all of the opinion of the court except Part VII C, which commences on page 68 of the circulated slip opinion.
 
 
 182
 I respectfully dissent to our recommending, in Part VII C, that the district courts "announce, at the time of sentencing, a sentence pursuant to ... [18 U.S.C. § 3553(a),] treating the Guidelines as advisory only."
 
 
 183
 This extraordinary recommendation from an intermediate to a more inferior federal court will doubtless be treated as a direction by many, even if not all, of the district courts in this circuit.
 
 
 184
 As a practical matter, if the advisory-only sentence is lower than the Guidelines sentence, an appeal will be guaranteed.
 
 
 185
 More importantly, such an extraordinary variance as we recommend from the usual rules of criminal procedure can only indicate to others a doubt, which should not exist, as to the outcome of the principal question in this case, the effect, if any, of Blakely on Guidelines sentencing. Blakely should not, and does not, have an effect on our Guidelines sentencing. And, even if the recommended advisory sentencing is discretionary, about which I have some doubt, in my opinion, it is inadvisable.
 
 
 186
 DIANA GRIBBON MOTZ, Circuit Judge, dissenting.
 
 
 187
 The Supreme Court has spoken: When a sentencing "system" permits a "judge [to] inflict[ ] punishment that the jury's verdict alone does not allow" it violates a defendant's Sixth Amendment right to trial by jury. Blakely v. Washington, ___ U.S. ___, ___, ___, 124 S.Ct. 2531, 2537, 2540, 159 L.Ed.2d 403 (2004). In this case, the United States Sentencing Guidelines permitted the district judge to inflict punishment on Mohammed Y. Hammoud thirty times greater than that allowed by the jury verdict alone. Blakely makes clear that such a sentence violates the Sixth Amendment; the majority can reach a contrary conclusion only by resolutely refusing to follow Blakely. Accordingly, although I join the majority in affirming Hammoud's convictions, I cannot join in its affirmance of this unconstitutional sentence.
 
 I.
 
 188
 The maximum sentence that the district judge could have imposed in this case, had he not made any additional factual findings, was 57 months.[1] The United States Sentencing Guidelines (the "Guidelines" or "federal guidelines"), however, directed the judge to make additional findings. The Guidelines further required the judge to increase Hammoud's sentence if the judge resolved, by a preponderance of the evidence, certain facts in favor of the Government. Obedient to the Guidelines, the judge made findings with respect to numerous facts that had never been considered by the jury or proved beyond a reasonable doubt. On the basis of these findings, the district judge sentenced Hammoud not to 57 months, but to 155 years.
 
 
 189
 Some of these judicial findings had nothing to do with the jury's verdict. For example, the jury never considered the issue of whether Hammoud had obstructed justice; in fact, none of the charges against him related in any way to obstruction. Yet the district court increased Hammoud's offense level (which with his criminal history category dictated his sentence range, see U.S. Sentencing Guidelines Manual (hereinafter "U.S.S.G."), Tbl. Ch. 5, Pt. A) because it found that he had done so. This required the court to make findings with respect to three facts never even presented to the jury: that Hammoud "when testifying under oath (1) gave false testimony; (2) concerning a material matter; (3) with the willful intent to deceive (rather than as a result of confusion, mistake, or faulty memory)." United States v. Jones, 308 F.3d 425, 428 n. 2 (4th Cir.2002) (citing United States v. Dunnigan, 507 U.S. 87, 92-98, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993)).
 
 
 190
 Other judicial findings, also mandated by the Guidelines, although at least relating to the facts found by the jury, required the district judge to increase Hammoud's sentence to an extraordinary degree beyond that permitted by the jury verdict alone. For example, the jury convicted Hammoud of three counts, each involving illegal cigarette trafficking of at least 60,000 cigarettes, which correlates to a tax loss of roughly $6,700. See 18 U.S.C. § 2341, 2342 (2000). The Guidelines, however, required the judge to determine by a preponderance of the evidence "the total tax loss attributable to the offense" looking to "all conduct violating the tax laws ... unless ... clearly unrelated." U.S.S.G. § 2T1.1, cmt. n.2. When the judge concluded that Hammoud had trafficked in many more cigarettes than his conviction reflected, resulting in a tax loss of over $2,500,000, the Guidelines required the judge to increase Hammoud's offense level by fourteen levels. See U.S.S.G. § 2E4.1, § 2T4.1.
 
 
 191
 Similarly, the jury found only that Hammoud knowingly provided material support to a foreign terrorist organization, 18 U.S.C. § 2339B(a)(1) (2000 & Supp. I); the jury never considered whether in doing so Hammoud also acted with the specific intent to "influence the conduct of government." 18 U.S.C.A. § 2332b(g)(5) (West 2000 & Supp.2004). Yet, the Guidelines required the district judge to determine whether Hammoud acted with this specific intent; and when the judge concluded by a preponderance of evidence that Hammoud had, the Guidelines required the judge to increase Hammoud's offense level by twelve levels and to set his criminal history category at VI. U.S.S.G. § 3A1.4.
 
 
 192
 Together, the judge's tax-loss and terrorism findings burdened Hammoud with an offense level and criminal history category so high that the Guidelines instructed the district judge to impose a life sentence. See U.S.S.G., Tbl. Ch. 5, Pt. A. In accord with United States v. Kinter, 235 F.3d 192, 199-200 (4th Cir.2000), the district judge "reduced" Hammoud's sentence from the Guidelines range of life to "only" 155 years — the total maximum sentence authorized under the statutes governing the offenses for which Hammoud was convicted.
 
 
 193
 Of course, the district judge cannot be faulted. In sentencing Hammoud, the judge simply followed the Guidelines and our holding that Guidelines-mandated sentence increases, contingent on judicial findings, survived the rule established in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). In Apprendi, the Supreme Court held that the Sixth Amendment requires that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id. at 490, 120 S.Ct. 2348. Soon thereafter, we held in Kinter that, without violating the Apprendi mandate, a judge may follow the Guidelines and make factual findings that increase the maximum sentence permitted by the jury verdict alone under the Guidelines, provided the ultimate sentence does not exceed the maximum allowed in the statute "criminalizing the offense." Kinter, 235 F.3d at 200. The district court precisely followed this instruction.
 
 
 194
 A few months ago, however, the Supreme Court decided Blakely. There the Court expressly rejected the Kinter view that the "statutory maximum," which could not be exceeded without violating Apprendi, was the sentence authorized by the statute "criminalizing the offense." The Court instead held: "[O]ur precedents make clear ... that the `statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." Blakely, ___ U.S. at ___, 124 S.Ct. at 2537 (emphasis in original) (citing Ring v. Arizona, 536 U.S. 584, 602, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); Harris v. United States, 536 U.S. 545, 563, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002) (plurality opinion); and Apprendi, 530 U.S. at 488, 120 S.Ct. 2348). Blakely instructs that the Sixth Amendment does not permit a "judge [to] inflict[] punishment that the jury's verdict alone does not allow." ___ U.S. at ___, 124 S.Ct. at 2537.[2] Moreover, in Blakely, the Supreme Court held that a jury's verdict alone does not allow the imposition of the highest sentence permitted under the statute criminalizing the offense when separate sentencing guidelines mandate a lesser maximum sentence. Id. at 2537-38.
 
 
 195
 Thus, the Supreme Court's decision in Blakely "make[s] clear," ___ U.S. at ___, 124 S.Ct. at 2537, that in Kinter we misinterpreted the term "statutory maximum" as used in Apprendi, and that the findings made by the district judge pursuant to the Guidelines, which increased Hammoud's sentence beyond that permitted by "the jury verdict alone," violated the Sixth Amendment.
 
 II.
 
 196
 The majority holds to the contrary by exempting the federal guidelines from the Blakely rule. In doing so, the majority acknowledges that, given the language of the Blakely holding, it is "not that farfetched to conclude that the Court intended to encompass within its holding any situation in which a binding maximum — whether statutory or not — is increased by virtue of a judicial finding." Ante at 349. But, according to the majority, that constitutes an "incorrect reading of Blakely." Id. at 352. The majority maintains that Blakely must be "understood," see id. at 349, 350, 352, to hold only that the Sixth Amendment prevents judicial factfinding that increases a "defendant's sentence beyond what the legislature has authorized as the consequence of a conviction or guilty plea." Ante at 353 (emphasis in original). The majority's "understanding" of Blakely actually constitutes a complete misunderstanding of the case.
 
 A.
 
 197
 First, the majority's "understanding" conflicts with both the actual holding and rationale of Blakely. As an intermediate appellate court, we have no license to develop an "understanding" of Supreme Court precedent at odds with the Supreme Court's own language and reasoning. Rather, we must follow Blakely as written, not as we would like it to have been written or as we "understand" it to have been written.
 
 As written, Blakely instructs:
 
 198
 Our precedents make clear ... that the "statutory maximum" for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant. In other words, the relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts which the law makes essential to the punishment, and the judge exceeds his proper authority.[3]
 
 
 199
 ___ U.S. at ___, 124 S.Ct. at 2537 (internal quotation marks and citations omitted). This language means exactly what it says: All defendants must be sentenced "solely on the basis of the facts reflected in the jury verdict." Id. The Supreme Court's express directive leaves no room for the majority's "understanding" of Blakely.
 
 
 200
 Nor does the Court's rationale permit the approach adopted by the majority. The Blakely Court rejected the very argument the Government poses here — that although the sentence imposed on the defendant exceeded the Guidelines'"standard range" maximum (i.e., the maximum absent additional judicial findings), "there [wa]s no Apprendi violation" because the sentence did not exceed the maximum allowed in the statute criminalizing the offense. Id. at 2535-38. The Court held that "the `statutory maximum' for Apprendi purposes" is the "standard range" maximum (i.e., 53 months) because that sentence — not the maximum sentence authorized in the statute "criminalizing the offense," Kinter, 235 F.3d at 200 — is the highest sentence that a judge could impose "solely on the basis of the facts admitted in the guilty plea." Blakely, ___ U.S. at ___, 124 S.Ct. at 2537. If the sentencing judge had imposed a sentence greater than 53 months without additional judicial fact-finding, "he would have been reversed." Id. at 2538. Hence, Blakely had an enforceable "legal right to" application of the maximum standard range sentence — it was his maximum sentence for "Apprendi purposes." Id. at 2537, 2540 (emphasis in original).
 
 
 201
 This rationale compels the conclusion that Hammoud's standard range maximum sentence under the federal sentencing guidelines (rather than the sentence set forth in the statutes criminalizing his offenses) constitutes his maximum sentence for Apprendi purposes. Hammoud's standard range maximum Guidelines sentence was 57 months; as the Government concedes, that is the highest sentence the district court could have imposed on Hammoud solely on the basis of the facts reflected in the jury verdict. Hammoud, like Blakely, had an enforceable legal right to that standard range maximum. For, as in Blakely, if the judge had imposed a sentence greater than this standard range maximum without additional judicial fact-findings, the judge "would have been reversed." ___ U.S. at ___, 124 S.Ct. at 2538; see also, e.g., United States v. Sayles, 296 F.3d 219, 227 (4th Cir.2002); United States v. Pineiro, 2004 WL 1543170, at *6 (5th Cir. July 12, 2004) (conceding that "[l]ike the judge who disregards the Washington sentencing rules, a federal judge who disregards the Guidelines does so on pain of reversal"); Kinter, 235 F.3d at 200 (acknowledging that if the district court had "disregarded the maximum" Guideline standard range, "we would have been required to vacate" the sentence).
 
 
 202
 Thus, both the holding and rationale of Blakely mandate that any sentence that exceeds "the maximum sentence [the] judge [could] impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant" violates the Sixth Amendment. Blakely, ___ U.S. at ___, 124 S.Ct. at 2537. Hammoud's 155-year sentence clearly exceeds the 57-month maximum sentence the district judge could have imposed solely on the basis of the jury verdict; ergo, it is unconstitutional. The majority's contrary "understanding" of Blakely simply misreads the case.
 
 B.
 
 203
 Moreover, this "understanding" rests on the most tenuous of foundations — a single fact given no significance by the Supreme Court itself — i.e., that the Blakely guidelines were entirely set forth in a statute and the federal guidelines are not. The majority elevates this lone fact, never relied on and barely mentioned by the Blakely Court, into the dispositive linchpin of the Court's analysis, maintaining that because of it, the Blakely rule does not apply to the federal guidelines. In doing so, the majority wishfully grabs at a straw, rather than engaging in the "close examination of Blakely," which it acknowledges is the proper focus. Ante at 345.
 
 
 204
 "Close examination" of Blakely quickly reveals that the Supreme Court never relied on the majority's assertedly dispositive fact. The Blakely Court notes the statutory origin of the Washington state guidelines only once — at the outset of its opinion when recounting the background of the case. Blakely, ___ U.S. at ___, 124 S.Ct. at 2535. The remainder of the opinion, containing the Court's extended reasoning, never again refers to this fact, let alone suggests that it is determinative. See id. at 2536-43.
 
 
 205
 On the contrary, the Blakely Court vigorously, almost self-consciously, rejects the very idea to which the majority clings: that importance attaches to whether or not a maximum sentence is set forth in a statute. The Court initially places the phrase "statutory maximum" in quotation marks — indicating that the phrase constitutes a term of art, subject to special definition. Id. at 2537. The Court then proceeds to provide that definition, a definition that does not contain any reference to the origin (statutory or not) of the maximum sentence. Rather, under this definition, which the Court tells us its "precedents make clear," the "`statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." Id.
 
 
 206
 Furthermore, time and again throughout its analysis, the Blakely Court employs language that reflects its total indifference to whether or not the "statutory maximum" for "Apprendi purposes" is actually embodied in a statute. See, e.g., id. at 2537 (referring to the "maximum [the judge] could have imposed under state law" when describing the facts in Ring and Apprendi) (emphasis added); id. at 2538 (observing that neither McMillan v. Pennsylvania, 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986), nor Williams v. New York, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949), "involved a sentence greater than what state law authorized") (emphasis added); id. (concluding that "[b]ecause the State's sentencing procedure did not comply with the Sixth Amendment, petitioner's sentence is invalid") (emphasis added); id. at 2540 (explaining how a sentencing "system" violates the Sixth Amendment) (emphasis added); id. at 2543 (noting that Blakely "was sentenced to prison for more than three years beyond what the law allowed") (emphasis added). The majority must ignore all of this language in order to hold that a single fact, regarded as inconsequential by the Blakely Court, constitutionally distinguishes that case from the one at hand.
 
 
 207
 This is precisely the sort of emphasis on "form" rather than "effect" that the Supreme Court has repeatedly held improper in determining the scope of Sixth Amendment jury-trial rights. See Ring, 536 U.S. at 602, 122 S.Ct. 2428 ("[T]he dispositive question . . . `is one not of form, but of effect.'" (quoting Apprendi, 530 U.S. at 494, 120 S.Ct. 2348)). For, although the federal guidelines (promulgated as they are by an administrative agency) are not statutes, they are, as we recognized in Kinter itself, "nearly indistinguishable from congressionally enacted criminal statutes." 235 F.3d at 200. The Guidelines have the force of statutory law, Stinson v. United States, 508 U.S. 36, 45, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993), and the maximum sentences contained in them "are incorporated into the federal statutes by 18 U.S.C. § 3553(b)" and "may not be exceeded by sentencing judges." Kinter, 235 F.3d at 200. The Sentencing Commission remains "fully accountable to Congress, which can revoke or amend any or all of the Guidelines as it sees fit ... at any time." Mistretta v. United States, 488 U.S. 361, 393-94, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989); see also United States v. Ameline, 376 F.3d 967, 977 (9th Cir.2004) (listing instances in which "Congress has utilized [its] authority to shape the Guidelines directly"). As Judge Posner noted in holding for the Seventh Circuit that the Blakely rule applies to the federal guidelines, "if a legislature cannot evade... the commands of the Constitution by a multistage sentencing scheme neither" can the Sentencing Commission, which is simply "exercising power delegated to it by Congress." United States v. Booker, 375 F.3d 508, 511 (7th Cir.2004), cert. granted, ___ U.S. ___, 125 S.Ct. 11, ___ L.Ed.2d ___, 73 USLW 3073, 2004 WL 1713654 (Aug. 2, 2004).
 
 C.
 
 208
 Most troubling, the majority's "understanding," which interprets Blakely as applying only to maximum sentences set forth in statutes and not to those set forth in the federal guidelines, undermines the very purpose of the Blakely holding.
 
 
 209
 The Supreme Court explained in Blakely that the Apprendi principle had to be applied to maximums set forth in sentencing guidelines to give "intelligible content" to Sixth Amendment rights, creating a "bright-line" rule. Blakely, ___ U.S. at ___, ___, 124 S.Ct. at 2538, 2540. Preservation of jury-trial rights as a "fundamental reservation of power in our constitutional structure," rather than a "mere procedural formality," required such a rule. Id. at 2538-39. Otherwise, a legislature could eviscerate Sixth Amendment rights by choosing to "label" a fact as a guidelines sentencing factor to be found by a judge by a preponderance of evidence, rather than a crime or element of a crime to be found by a jury beyond a reasonable doubt. Id. Yet the majority's holding, that maximum sentences set out in the federal guidelines do not constitute "statutory maximums" for "Apprendi purposes," leaves Congress free to undercut Sixth Amendment rights in the very manner Blakely sought to prohibit. Under the majority's holding, Congress can choose not to criminalize conduct yet still require the Sentencing Commission to develop guidelines mandating punishment of that very conduct upon a judicial finding by a mere preponderance of the evidence.
 
 
 210
 The Blakely Court clearly recognized that the federal guidelines presented this problem. Witness the Court's discussion of whether obstruction of justice should constitute a sentencing factor or a separate crime. Citing the upward adjustment required upon a judicial finding of obstruction of justice in the federal guidelines, U.S.S.G. § 3C1.1, Justice O'Connor, in dissent, complained that the Blakely rule would prevent consideration at sentencing of obstructive behavior not discoverable before trial. See Blakely, ___ U.S. at ___, 124 S.Ct. at 2546 (O'Connor, J., dissenting). In response, the Blakely majority suggested that perjury during trial should be "an entirely separate offense to be found by a jury beyond a reasonable doubt"; to treat it as a fact to be considered by the sentencing judge would be "[a]nother example of conversion from separate crime to sentence enhancement." Id. at 2540 n. 11. Yet, in the case at hand, the majority sanctions exactly this "conversion," by affirming a sentence enhanced by a judicial finding of obstruction of justice, in a case in which the jury never considered any evidence as to obstruction.
 
 
 211
 Affirmance of the obstruction enhancement, moreover, is neither the most obvious nor most significant example in this case of the manner in which the majority's holding undermines Blakely's stated purpose of creating a bright-line rule safeguarding Sixth Amendment rights. For in the case at hand, the federal guidelines also required the district judge to determine if Hammoud acted with specific intent "to influence ... the conduct of government by intimidation," 18 U.S.C. § 2332b(g)(5), and, if so, to apply a "terrorism adjustment" — even though specific intent has long been recognized as an element of a crime to be determined by a jury beyond a reasonable doubt. See, e.g., Carter v. United States, 530 U.S. 255, 120 S.Ct. 2159, 147 L.Ed.2d 203 (2000). The Guidelines-mandated application of the terrorism adjustment and other judicial findings increased Hammoud's sentence beyond what would have been justified by the jury's verdict alone by more than 3000%.
 
 
 212
 That the Sentencing Commission, not Congress itself, fashioned the guideline that required this "conversion" plainly fails to eliminate the Sixth Amendment problem targeted by the Supreme Court. Not only is the Commission generally "fully accountable to Congress, which can revoke or amend any or all of the Guidelines as it sees fit ... at any time," Mistretta, 488 U.S. at 393-94, 109 S.Ct. 647, but in this instance Congress expressly directed the Commission to promulgate a terrorism guideline, with specific intent as an "appropriate enhancement." See Violent Crime Control Act, Pub.L. 103-322, Sept. 13, 1994, 108 Stat. 1796, § 120004 (directing the Commission "to amend its sentencing guidelines to provide an appropriate enhancement for any felony ... that involves or is intended to promote international terrorism, unless such involvement or intent is itself an element of the crime"). Thus, the unconstitutional "conversion" of a crime to a sentencing factor is as clearly the responsibility of Congress in the case at hand as it was of the Washington legislature in Blakely.
 
 
 213
 In sum, the majority adopts an "understanding" of Blakely at odds with the case's holding and rationale, based entirely on a single fact of no importance to the Blakely Court itself. This "understanding" places form over effect, violating the Supreme Court's express mandate that "the dispositive question . . . `is one not of form, but of effect.'" Ring, 536 U.S. at 602, 122 S.Ct. 2428 (quoting Apprendi, 530 U.S. at 494, 120 S.Ct. 2348). Most regrettably, this "understanding" undermines the very purpose of the Blakely holding—the creation of a bright-line rule to ensure protection of jury-trial rights. Instead of adopting this "understanding" of Blakely, we should follow Blakely as written. In short, we should, as the Supreme Court directed, hold that the "`statutory maximum' for Apprendi purposes is the maximum a judge may impose solely on the basis of facts reflected in the jury verdict". Blakely, 124 S.Ct. at 2537.
 
 III.
 
 214
 The majority seeks to justify its refusal to follow Blakely's clear directive by asserting that to do so would create two problems.[4] The justification fails; these alleged problems are mere makeweights.
 
 A.
 
 215
 First, the majority contends that following this directive would mean that the Blakely Court did not, as it said it had, "apply" the Apprendi rule, but instead broadened that rule by "redefining" the term "statutory maximum" to extend the term to non-statutory sentences. See ante at 349, 351, 352. The majority's contention, however, rests on an entirely false premise: that the definition of "statutory maximum" set forth in Blakely differs from the Court's definition of that term in Apprendi.
 
 
 216
 As the majority recognizes, the Blakely Court carefully explained that it did not "redefine" the term "statutory maximum," but simply "applied" the Apprendi understanding of that term. See Blakely, 124 S.Ct. at 2537. What the majority refuses to recognize is that the Blakely Court also carefully explained that the term "statutory maximum," as it was used in Apprendi, means "the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." Id. Thus, immediately prior to stating this definition of "statutory maximum," the Blakely Court noted that the definition was the one "made clear" by "[o]ur precedents," citing Apprendi and its progeny, Ring and Harris. Id.
 
 
 217
 That the courts of appeals, including this one in Kinter, misinterpreted the meaning of "statutory maximum" as used in Apprendi by construing it too narrowly, of course, sheds no light on the correct interpretation of the term in Apprendi. Rather, we must take the Supreme Court at its word — that in Blakely it "applied" Apprendi, setting forth the meaning of "statutory maximum" as that term was used in Apprendi.
 
 B.
 
 218
 The majority's other "problem" with following Blakely as written is that doing so would assertedly "undermine" or "outright nullify" Supreme Court decisions prior to Blakely. See ante at 350-52. This is a powerful argument — if, but only if, a prior Supreme Court decision directly controls the case at hand. When that is so, of course, "Court[s] of Appeals should follow the [Supreme Court] case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." Agostini v. Felton, 521 U.S. 203, 237, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) (internal quotation marks and citation omitted). But, as the Government expressly conceded at oral argument, there is no Supreme Court case "directly controlling" the case at hand. Thus, as the Government acknowledged, the Agostini rule does not apply here.[5] Tellingly, in Kinter, this court took the same view. We did not suggest that holding that "statutory maximum" for Apprendi purposes included Guidelines' maximums would "undermine" or "outright nullify" Supreme Court precedent; instead, we characterized the issue as "complex" and recognized "at least a colorable argument that the Sentencing Guidelines do provide [the relevant] maximum." See Kinter, 235 F.3d at 200-201.
 
 
 219
 The majority carefully avoids citation of Agostini (perhaps hoping to escape reminder of the Government's express concession and our rationale in Kinter) but nonetheless seeks to apply the Agostini rule and treat prior Supreme Court cases as squarely presenting (and resolving) the Sixth Amendment question at issue here. Prior Supreme Court precedent, however, simply does not reach the constitutional issue presented here. As every other court of appeals to have considered the question has held, the Supreme Court cases relied on by the majority "do not discuss the Sixth Amendment right to a jury trial" and a holding that the "statutory maximum" for "Apprendi purposes" includes Guidelines maximums "would not directly `overrule' any Supreme Court holding." Pineiro, 377 F.3d 464, 2004 WL 1543170, at *9; see also Ameline, 376 F.3d at 977-78; Booker, 375 F.3d at 513-14.
 
 
 220
 The fact is that the Supreme Court has never upheld the use of the judicial fact-finding mandated by the federal guidelines in the face of a direct Sixth Amendment challenge to that practice. Not one of the cases relied on by the majority reaches that question. In Mistretta, the Court simply held that the creation of the Sentencing Commission and federal guidelines did not violate separation of powers and delegation principles; the Court did not consider whether application of certain federal guidelines violated the Sixth Amendment. 488 U.S. at 393-94, 109 S.Ct. 647. In United States v. Watts, the Court ruled only that a Guidelines sentence withstood a Fifth Amendment Double Jeopardy challenge. 519 U.S. 148, 157, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997). And, in Edwards v. United States, the Court expressly disclaimed consideration of any constitutional claims. 523 U.S. 511, 118 S.Ct. 1475, 140 L.Ed.2d 703 (1998); id. at 516, 118 S.Ct. 1475 (noting that we "need not, and we do not, consider the merits of petitioners' . . . constitutional claims").[6]
 
 
 221
 In refusing to follow Blakely's plain language, purportedly because to do so would "undermine" or "outright nullify" prior Supreme Court precedent, the majority does not just misapply the Agostini rule. It also avoids our constitutional duty to decide properly presented claims in accord with current Supreme Court instruction. As Judge Bork explained, even if lower courts believe, as the majority apparently does, that "more recent decisions" of the Supreme Court "create discontinuities with older precedent," lower courts must discern and apply the law as it presently exists and "leave" the "resolution of such discontinuities, if such there be" to the Supreme Court. Haitian Refugee Center v. Gracey, 809 F.2d 794, 798 (D.C.Cir.1987) (Opinion of Bork, J.).
 
 IV.
 
 222
 The majority offers no legitimate reason for refusing to apply the Supreme Court's instruction—"that the `statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." 124 S.Ct. at 2537 (emphasis in original). The Supreme Court has held that the Sixth Amendment affords "[e]very defendant... the right to insist that the prosecutor prove to a jury all facts legally essential to the punishment." Id. at 2543 (first emphasis added). Neither the Supreme Court, nor the Constitution, permits us to deny this right to defendants prosecuted by the federal government. The majority's holding does precisely that. Accordingly, I must respectfully dissent.
 
 
 223
 Judge MICHAEL and Judge GREGORY join in this dissent.
 
 
 
 Notes:
 
 
 [1]
 The Government expressly so concedes, explaining that "stripped of any judge-found enhancing facts Hammoud face[d] a guidelines sentencing range of 46-57 months" because "using the proper Guidelines Manual (the 1998-99 edition), if all counts of conviction are grouped together, the money laundering Guideline § 2S1.1 provides the greatest offense level — 23" and "[c]oupled with a Criminal History Category I, a level 23 yields a 46-57 month range." Supplemental Brief of the United States at 34 n.19, amended by Letter of July 28, 2004
 
 
 [2]
 InBlakely, the judge-found facts increased the defendant's sentence by 70% — from 53 to 90 months. Id. at 2540. Here, the judge-found facts increased Hammoud's sentence by more than 3000% — from 57 to 1860 months.
 
 
 [3]
 The majority characterizes this language — theBlakely holding — as the "culprit" that had led other courts to conclude that the Blakely rule applies to the federal guidelines. Ante at 348. The majority's word choice is odd — and revealing. A "culprit" is "one accused of ... a crime" or "fault" or "guilty of a crime" or "fault." Webster's Third New International Dictionary 552 (1993). By choosing to characterize this language as a "culprit," the majority clearly signals its distaste for the Blakely holding. The majority apparently has forgotten that dislike of, or disagreement with, a Supreme Court holding does not provide a lower court with a basis for refusing to follow the holding.
 
 
 [4]
 Unlike the majority, which recognizes theBlakely (and Apprendi) directive but argues that it does not apply to the federal guidelines, Judge Wilkinson in concurrence essentially argues that the Supreme Court got it wrong. He contends that, "[i]f the judiciary is now to announce that sentencing factors must be found as elements beyond a reasonable doubt, that badly skews the balance that Congress has historically been able to strike between guilt and punishment," and represents an encroachment of the judiciary on the province of the legislature. Ante at 357. But treating "sentencing factors" that mandate enhancement of a sentence as "elements" is exactly what Blakely, Ring, and Apprendi hold the Sixth Amendment requires: "[A]ll facts legally essential to the punishment" must be proved to a jury beyond a reasonable doubt, Blakely, 124 S.Ct. at 2537 — whether they are labeled "elements of the offense, sentencing factors, or Mary Jane." Ring, 536 U.S. at 610, 122 S.Ct. 2428 (Scalia, J. concurring); see also Ring, 536 U.S. at 602, 122 S.Ct. 2428; Apprendi, 530 U.S. at 494 n. 19, 120 S.Ct. 2348. In the face of this controlling precedent, the concurrence's diatribe is surprising — and inappropriate. (Although the concurrence offers a long, rhetoric-filled response to this footnote, ante at 359 n. 1, it still refuses to acknowledge that the Supreme Court has already rejected its view that the legislature always controls what facts must be proved to a jury; the Court has concluded that all facts essential to punishment, including those denominated "sentencing factors" by the legislature, must be proved to a jury "to give intelligible content to the right of jury trial." Blakely, ___ U.S. at ___, 124 S.Ct. at 2538. The Court apparently determined that this holding was not "antithetical to our democracy," ante at 359, but required by it, in order to accomplish the judiciary's most important function: protecting individual constitutional rights from legislative encroachment).
 
 
 [5]
 The Government's concession that theAgostini rule does not apply here accords with the fine amicus brief the United States filed on behalf of the State in Blakely. There, the Government did not even imply that prior Supreme Court precedent precluded application of the Apprendi rule to the federal guidelines. On the contrary, the Government warned that "[a] decision in favor of [Blakely] could ... raise a serious question about whether Apprendi applies to myriad factual determinations under the Guidelines." Brief for the United States as Amicus Curiae, No. 02-1632, 2004 WL 177025, at *26.
 
 
 [6]
 Moreover, the petitioners inEdwards did not raise a Sixth Amendment challenge to sentencing factors grounded in judicial findings under the Guidelines; they argued only that the sentencing judge's selection of the relevant maximum under the statutes at issue violated the Sixth Amendment. See Ameline, 376 F.3d at 978 (characterizing Edwards in the same way); Booker, 375 F.3d at 514 (observing that "the petitioners in Edwards did not argue that the sentencing guidelines are unconstitutional" and concluding that "[t]he most that can be dug out of their briefs ... is that they were urging a statutory interpretation that would avoid a Sixth Amendment issue") (emphasis in original). Accordingly, it is hardly surprising that, notwithstanding the majority's reliance on Edwards, we did not cite the case in Kinter, let alone suggest, as the majority now does, that Edwards answered the question of whether the Apprendi rule applies to the Guidelines. Nor did the Government, which now also heavily leans on Edwards, even mention the case in its amicus brief in Blakely.
 
 
 
 224
 GREGORY, Circuit Judge, dissenting.
 
 
 225
 I join in full Judge Motz's fine dissenting opinion on the Blakely issues. I write separately, however, to dissent from the judgment. I believe the majority incorrectly concludes that AEDPA's "material support" provision, 18 U.S.C. § 2339B, is constitutional as applied in this case. As the Ninth Circuit has held, a strict textual reading of § 2339B(a)(1)'s plain language raises serious due process concerns. See Humanitarian Law Project v. U.S. Dep't of Justice, 352 F.3d 382, 396 (9th Cir.2003) (hereinafter "Humanitarian Law Project III") ("We believe that serious due process concerns would be raised were we to accept the argument that a person who acts without knowledge of critical information about a designated organization presumably acts consistently with the intent and conduct of that designated organization.").[1]
 
 
 226
 Unlike the Ninth Circuit, however, I do not believe that these constitutional infirmities can be cured by reading the statutory term "knowingly" as a scienter requirement meaning only that the defendant had knowledge of the organization's designation as a foreign terrorist organization ("FTO"), or that he or she knew of the organization's unlawful activities that caused it to be so designated.[2] See id. at 400. But cf. Humanitarian Law Project v. Reno, 205 F.3d 1130 (9th Cir.2000) ("Humanitarian Law Project II") (Kozinski, J.) (stating "the term `knowingly' modifies the verb `provides,' meaning that the only scienter requirement here is that the accused violator have knowledge of the fact that he has provided something, not knowledge of the fact that what is provided in fact constitutes material support"). Instead, I would follow the reasoning of United States v. Al-Arian, 308 F.Supp.2d 1322 (M.D.Fla.2004), and conclude that to save the statute, one must apply the mens rea requirement to the entire "material support" provision such that the government must prove that the defendant (1) knew the organization was a FTO or knew of the organization's unlawful activities that caused it to be so designated and (2) knew what he or she was providing was "material support," i.e., the government must show that the defendant had a specific intent that the support would further the FTO's illegal activities. Because Hammoud was convicted of "material support" without the proper scienter requirement, violating his constitutional rights under the First and Fifth Amendments, I would hold that these constitutional violations constitute plain error and thus vacate his material support conviction.
 
 I.
 
 227
 Hammoud and his Amici Curiae, the Center for Constitutional Rights, the National Coalition to Protect Political Freedom, the National Association of Criminal Defense Lawyers, and the National Lawyers Guild, raise a bevy of constitutional challenges to Hammoud's conviction under 18 U.S.C. § 2339B, including assertions that the "material support" provision is vague and overbroad in violation of the First Amendment, and that the statute violates the First and Sixth Amendments because the defendant cannot challenge the FTO designation. Moreover, Hammoud and Amici Curiae challenge Hammoud's conviction on the basis that the statute lacks a specific intent requirement, which they contend is essential to avoid "guilt by association" in violation of the First and Fifth Amendments.
 
 A.
 
 228
 To be sure, Hammoud faces a most difficult burden in this case because he failed to raise his constitutional claims at trial. Accordingly, we review his claims for plain error. United States v. Higgs, 353 F.3d 281, 324 (4th Cir.2003) (reviewing constitutional claim not raised below for plain error); United States v. Ferguson, 211 F.3d 878, 886 (5th Cir.2000) (reviewing allegation of constitutional violation for plain error because defendant failed to raise the issue below). But cf. United States v. Osborne, 345 F.3d 281, 284 n. 2 (4th Cir.2003) (noting that the Tenth Circuit applies the plain error rule "less rigidly" when reviewing constitutional issues) (citing United States v. Ciapponi, 77 F.3d 1247, 1249-50 (10th Cir.1996)).[3] To satisfy this standard, Hammoud must show that (1) an error occurred,(2) the error was plain, (3) and the error affected his substantial rights. United States v. Olano, 507 U.S. 725, 731-34, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993); accord Johnson v. United States, 520 U.S. 461, 467, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997). If the first three elements are met, we may exercise our discretion to correct such forfeited error only where it "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." Olano, 507 U.S. at 732, 113 S.Ct. 1770 (internal quotation marks and citations omitted); see also Fed.R.Crim.P. 52(b) (2002) ("A plain error or defect that affects substantial rights may be considered even though it was not brought to the court's attention."). When "overwhelming and essentially uncontroverted" evidence exists to support the challenged finding, there is "no basis for concluding that the error seriously affected the fairness, integrity or public reputation of judicial proceedings." United States v. Cotton, 535 U.S. 625, 633, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002) (internal quotation marks and citations omitted).
 
 B.
 
 229
 In 8 U.S.C. § 1189(a), Congress authorized the Secretary of State (hereinafter the "Secretary") to designate an organization as a "foreign terrorist organization." To exercise this authority, the Secretary must find the organization (1) is foreign, (2) engages in terrorist activity, and (3) such activity threatens the security of United States nationals or the national security of the United States. Id. § 1189(a)(1).[4] In determining whether to designate an organization as a FTO, the Secretary is not required to notify the organization being considered for designation. Moreover, the organization does not have a right to be heard during the designation process.[5] Instead, the Secretary compiles an "administrative record" in which "findings" are made as to whether an organization is to be designated. Id. §§ 1189(a)(2)(A)(i), (3)(A).
 
 
 230
 If an organization is so designated, the consequences are "dire." Nat'l Council of Resistance of Iran, 251 F.3d at 196. Its members and representatives may not enter the United States, 8 U.S.C. § 1182(a)(3)(B)(i), its assets may be frozen by the Department of Treasury, id. § 1189(a)(2)(C), and financial institutions are required to freeze its assets, 18 U.S.C. § 2339B(a)(2). Moreover, as is at issue here, § 2339B makes it a crime punishable by a maximum of life imprisonment if a person "knowingly provides material support or resources" to such an organization. Id. § 2339B(a)(1). "Material support or resources" includes "currency or monetary instruments, financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, transportation, and other physical assets, except medicine and religious materials." Id. §§ 2339A(b), 2339B(g)(4).[6] The statute does not define what those terms mean in the context of the proscribed activity.
 
 
 231
 A designated organization may seek review of the Secretary's designation, but may only do so in the Court of Appeals for the District of Columbia. Id. § 1189(b)(1). The District of Columbia Circuit's review is "based solely upon the administrative record," but the government may submit classified information for in camera review. Id. § 1189(b)(2). Moreover, the Secretary's designation may only be set aside if it is arbitrary or capricious, or otherwise contrary to law. Id. Finally, § 1189(a)(8) expressly states that a defendant may not contest the validity of the organization's designation as a defense or objection at trial.
 
 
 232
 In both October of 1997 and October of 1999, the Secretary designated Hizballah as a FTO. 64 Fed.Reg. 55,112 (1999); 62 Fed.Reg. 52,650 (1997). Neither the record nor case law indicates that Hizballah has ever challenged the validity of this designation.
 
 
 233
 In the instant case, Count 72 of the Second Superceding Indictment alleged that Hammoud engaged in a conspiracy to provide "material support" to Hizballah and that its objective was to furnish the FTO "currency, financial services, training, false documentation and identification, communications equipment, explosives and other physical assets to Hizballah and its operatives, in order to facilitate its violent attacks." J.A. 482 ¶ 3. Hammoud was identified as a fund-raiser, id. at 483 ¶ 4(e), and Count 78 alleged that he provided material support to Hizballah by transmitting $3,500 to Sheik Abbas Harake via Said Harb, id. at 498 ¶ 2. The jury convicted Hammoud on both counts.
 
 II.
 
 234
 As noted above, Hammoud levies a series of interwoven[7] First and Fifth Amendment challenges against AEDPA's material support provisions. Specifically, he alleges that the material support provision (1) penalizes association; (2) is impermissibly vague; (3) is facially overbroad;[8] and (4) violates due process and his Sixth Amendment right to a jury trial.[9]
 
 A.
 
 235
 Hammoud and Amici Curiae argue that the "material support" provision is unconstitutional because it penalizes association, in violation of the First Amendment, and fails to require the requisite specific intent, thus contravening the Fifth Amendment requirement of "personal guilt." They first frame these arguments by relying on the unimpeachable, but basic and preliminary, proposition that the Constitution protects individuals from being punished solely because of their association with a group. See NAACP v. Claiborne Hardware Co., 458 U.S. 886, 920, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982) (holding that "liability may not be imposed merely because an individual belonged to a group, some members of which committed acts of violence"); Healy v. James, 408 U.S. 169, 186, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972) (holding that "guilt by association" may not be imposed); Scales v. United States, 367 U.S. 203, 229, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961) ("If there were a[] blanket prohibition of association with a group having both legal and illegal aims, there would indeed be a real danger that legitimate political expression or association would be impaired.").
 
 
 236
 The counter argument to this basic proposition, of course, is that § 2339B does not seek to impose criminal liability for association or membership alone, but instead does so for involvement in terrorism—i.e., "material support." In this vein, the government asserts that Hammoud's arguments obscure the gravamen of the offense of which he was convicted; specifically, it argues that the overt act of providing $3,500 to Said Harb, which was passed on to Sheik Abbas Harake, is distinguishable from association.[10] To advance its argument, the government relies on a body of cases in which AEDPA's material support provision has been held distinguishable from a prohibition on association. See People's Mojahedin Org. of Iran v. Dep't of State, 327 F.3d 1238, 1244 (D.C.Cir.2003) (holding the material support provision does not violate rights of free speech and association); Humanitarian Law Project II, 205 F.3d at 1133 ("[AEDPA] does not prohibit being a member of one of the designated groups .... Plaintiffs are even free to praise the group for using terrorism as a means of achieving their ends. What AEDPA prohibits is the act of giving material support, and there is no constitutional right to facilitate terrorism by giving terrorists the weapons and explosives .... Nor, of course, is there a right to provide resources with which terrorists can buy weapons and explosives."); United States v. Sattar, 272 F.Supp.2d 348, 368 (S.D.N.Y.2003) (rejecting "associational rights" claim); United States v. Lindh, 212 F.Supp.2d 541, 549 (E.D.Va.2002) (same).[11] Typical of this line of cases in which pure First Amendment challenges are at issue, in Humanitarian Law Project II, 205 F.3d at 1133-34, the Ninth Circuit considered the constitutionality of AEDPA's material support provision. In doing so, the Ninth Circuit held that a "specific intent" requirement, as in the communism cases, should not apply to the provision of material support, because donating money and resources to a designated group is different than being a mere member of, or advocate for, the group in question. Id.
 
 B.
 
 237
 Here, however, Hammoud and Amici Curiae also advance a legally independent—though somewhat interrelated to the First Amendment argument — Fifth Amendment Claim, see Scales, 367 U.S. at 225, 81 S.Ct. 1469 (analyzing Fifth Amendment claim "independently of the claim made under the First Amendment"), which Humanitarian Law Project II and the other cases noted above did not reach. Specifically, to pass Fifth Amendment scrutiny and to avoid a "personal guilt" problem, they argue that AEDPA's material support provision must include a scienter requirement, whereby the defendant must be found guilty of a specific intent to further the illegal aims of the association. Br. of Appellant at 25; Br. of Amici Curiae at 6 ("This statute is so sweeping that it would apply to a citizen who sent a human rights or constitutional law treatise to Hizballah to urge it to respect human rights and desist from committing terrorist acts."). Hammoud and Amici Curiae rely on more Communist Party cases to support their argument that AEDPA's "material support" provision is unconstitutional without such a specific intent requirement. See, e.g., United States v. Robel, 389 U.S. 258, 264, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967) (striking sections of statute that prohibited communists from registering to engage in employment at defense facilities); Aptheker v. Sec'y of State, 378 U.S. 500, 511, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964) (striking down statutory provisions that prohibited members of communist organization from applying for or using a passport because statute did not require specific intent to further the unlawful aims of the organization); Scales, 367 U.S. at 224-25, 81 S.Ct. 1469 (stating that "[i]n our jurisprudence guilt is personal" and holding that punishment can only be justified by connecting "status or conduct to other concededly criminal activity"). In such cases, the Court held that statutory prohibitions "swep[t] too widely and too indiscriminately across the liberty guaranteed in the Fifth Amendment," Aptheker, 378 U.S. at 514, 84 S.Ct. 1659, because the statutes carried the "danger of punishing a member of a Communist organization `for his adherence to lawful and constitutionally protected purposes, because of other and unprotected purposes which he does not share.'" Id. at 512, 84 S.Ct. 1659 (quoting Noto v. United States, 367 U.S. 290, 299-300, 81 S.Ct. 1517, 6 L.Ed.2d 836 (1961) and citing Scales, 367 U.S. 203, 81 S.Ct. 1469).
 
 
 238
 Hammoud and Amici Curiae assert that without a specific intent requirement, AEDPA's material support provision suffers the same fate. In this context, Amici Curiae posit that Humanitarian II's isolated focus on the First Amendment renders the prohibition on guilt by association a meaningless formality because under the Ninth Circuit's reasoning:
 
 
 239
 [E]very anti-Communist law struck down by the Supreme Court for imposing guilt by association could have simply been rewritten to penalize dues payments to the Party. It would also lead to the anomalous result that while leaders of the NAACP could not be held responsible for injuries sustained during an NAACP-led economic boycott absent proof of specific intent, Claiborne Hardware, 458 U.S. at 920, 102 S.Ct. 3409, the NAACP's thousands of individual donors could have been held liable without any showing of specific intent.
 
 
 240
 Amicus Br. at 8-9. As the Supreme Court has stated in the Fifth Amendment context:
 
 
 241
 In our jurisprudence guilt is personal, and when the imposition of punishment on a status or on conduct can only be justified by reference to that relationship of that status or conduct to other concededly criminal activity . . ., that relationship must be sufficiently substantial to satisfy the concept of personal guilt in order to withstand attack under the Due Process Clause of the Fifth Amendment.
 
 
 242
 Scales, 367 U.S. at 224-25, 81 S.Ct. 1469. Accordingly, Hammoud and Amici Curiae argue that without a scienter requirement of specific intent, the necessary connection to criminal activity is wanting.
 
 
 243
 Nevertheless, the government argues, Br. of Gov't at 22 n.9, that the Ninth Circuit's most recent examination of the "material support" provision within the Fifth Amendment context in Humanitarian Law Project III assures that the necessary scienter requirement is satisfied, thus preventing any Fifth Amendment violation. In Humanitarian Law Project III, the Ninth Circuit considered a Fifth Amendment "personal guilt" challenge to the "material support" provisions, and correctly recognized that "serious due process concerns" would be raised by § 2339B unless the statute is applied with a scienter requirement. 352 F.3d at 393-94, 396-97. Like in the Communist Party cases upon which Hammoud and Amici Curiae rely, the Ninth Circuit stated that AEDPA's material support provision "presumes that a person acts with guilty intent whenever that person provides material support to a designated organization." Id. at 396. The court further remarked, "to attribute the intent to commit unlawful acts punishable by life imprisonment to persons who acted with innocent intent—in this context, without critical information about the relevant organization—contravenes the Fifth Amendment's requirement of `personal guilt.'" Id. at 397.
 
 
 244
 However, to avoid the "serious due process concerns [that] would be raised were we to accept the argument that a person who acts without knowledge of critical information about a designated organization presumably acts consistently with the intent and conduct of that designated organization," id., the Ninth Circuit followed the Supreme Court's guidance "that `a statute is to be construed where fairly possible so as to avoid substantial constitutional questions.'" Id. (quoting United States v. X-Citement Video, Inc., 513 U.S. 64, 69, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994)). Thus, in its efforts to apply § 2339B constitutionally, the court adhered to well-settled Supreme Court law that there is a presumption of construing criminal statutes to include a mens rea requirement. Id. (citing cases). In applying those principles, the Ninth Circuit determined, as a matter of statutory interpretation, that § 2339B "does not in any way suggest that Congress intended to impose strict liability on individuals who donate `material support' to designated organizations." Id. at 399. Accordingly, the Ninth Circuit read the word "knowingly" as a limited specific intent requirement, demanding "proof that a defendant knew of the organization's designation as a terrorist organization or proof that a defendant knew of the unlawful activities that caused it to be so designated... to convict a defendant under the statute." Id. at 400; see also id. at 402-03 (holding that to convict under § 2339B, "the government must prove beyond a reasonable doubt that the donor had knowledge that the organization was designated by the Secretary as a[FTO] or that the donor had knowledge of the organization's unlawful activities that caused it to be so designated").
 
 
 245
 While the Ninth Circuit's interpretation of "knowingly" is more advanced than the quasi-strict liability standard upon which Hammoud was convicted, infra, I submit that such an interpretation of § 2339B's mental state requirement is still insufficient to withstand constitutional attack. In finding as much, I am in agreement with the recent and well reasoned opinion in United States v. Al-Arian, 308 F.Supp.2d 1322 (M.D.Fla.2004), in which the court considered defendants' motion to dismiss an indictment alleging a violation of AEDPA's "material support" provisions.
 
 
 246
 In Al-Arian, the court agreed with the Ninth Circuit that "a purely grammatical reading of the plain language of Section 2339B(a)(1) makes it unlawful for any person to knowingly furnish any item contained in the material support categories" to a FTO, rendering the provision constitutionally infirm. Id. at 1337 (citing Humanitarian II). The court, however, disagreed with the Ninth Circuit's attempt to salvage the statute based on application of the statutory term "knowingly" in Humanitarian III, stating that the Ninth Circuit's construction "only cures some of the Fifth Amendment concerns." Id. The Al-Arian court first correctly recognized that the Ninth Circuit failed to comply with the Supreme Court's X-Citement Video holding wherein it stated that a mens rea requirement "should apply to each of the statutory elements that criminalize otherwise innocent conduct," 513 U.S. at 72, 115 S.Ct. 464, because Humanitarian III applied the mens rea requirement only to the FTO element, not the material support element. Al-Arian, 308 F.Supp.2d at 1337. As such, the Al-Arian court found that under the Ninth Circuit's construction:
 
 
 247
 [A] cab driver could be guilty for giving a ride to a FTO member to the UN, if he knows that the person is a member of a FTO .... Similarly, a hotel clerk in New York could be committing a crime by providing lodging to that same FTO member under similar circumstances as the cab driver.
 
 
 248
 Id. at 1337-38.[12] Accordingly, the court rejected Humanitarian III's construction, stating that the Ninth Circuit did not resolve the vagueness concerns. Id. at 1338.[13]
 
 
 249
 Yet rather than declare § 2339B unconstitutionally vague, the court applied a saving construction consistent with X-Citement Video, and applied the statute in the manner Hammoud and Amici Curiae advocate. Id. at 1338-39. The court stated:
 
 
 250
 to convict a defendant under Section 2339B(a)(1) the government must prove beyond a reasonable doubt that the defendant knew that (a) the organization was a FTO or had committed unlawful activities that caused it to be so designated; and (b) what he was furnishing was "material support." To avoid Fifth Amendment personal guilt problems ... the government must show more than a defendant knew something was within a category of "material support" in order to meet (b). In order to meet (b), the government must show that the defendant knew (had a specific intent) that the support would further the illegal activities of a FTO.
 
 
 251
 Id. at 1338-39 (emphasis added).[14] Indeed, I note that the Al-Arian court's interpretation of § 2339B's intent requirement, with which I fully agree, is supported by statements in the Congressional Record by Senator Hatch, who cosponsored AEDPA. In introducing the Senate Conference Report to the Senate, Senator Hatch remarked: "This bill also includes provisions making it a crime to knowingly provide material support to the terrorist functions of foreign groups designated by a Presidential finding to be engaged in terrorist activities." 142 Cong. Rec. 7550 (April 16, 1996) (statement of Sen. Hatch) (emphasis added). In discussing the law, Senator Hatch seemingly made clear that the law's prohibitions on financing were connected to terrorist acts; he stated:
 
 
 252
 [N]othing in the Constitution provides the right to engage in violence against fellow citizens or foreign nations. Aiding and financing foreign terrorist bombings is not constitutionally protected activity.... I have to believe that honest donors to any organization want to know if their contributions are being used for such scurrilous terrorist purposes. We are going to be able to tell them after this bill.... I am convinced we have crafted a narrow but effective designation provision which meets these obligations while safeguarding the freedom to associate, which none of us would willingly give up.
 
 
 253
 Id. at 7557 (statement of Sen. Hatch) (emphasis added).
 
 
 254
 Furthermore, the Al-Arian court also recognized its conclusions regarding § 2339B were consistent with the Seventh Circuit's treatment of the material support provisions in Boim v. Quranic Literacy Institute & Holy Land Foundation for Relief and Development, 291 F.3d 1000 (7th Cir.2002), which addressed § 2339B in a related context. See Al-Arian, 308 F.Supp.2d at 1339 n. 33. In Boim, the Seventh Circuit considered whether a § 2339B violation could serve as a basis for § 2333 civil liability. The Seventh Circuit acknowledged that the statute contained "tension" regarding a "definition of acts of international terrorism ... so broad that [defendants] might be held liable for involvement in terrorist activity when all they intended was to supply money to fund the legitimate, humanitarian mission of Hamas or other organizations." Boim, 291 F.3d at 1022. To resolve that tension arising "when a group engages in both protected advocacy and unprotected criminal acts," the Seventh Circuit turned to Claiborne Hardware, Scales and other Communist Party cases and held that to succeed on a § 2333 claim, a plaintiff must prove "`that the group itself possessed unlawful goals and that the individual held a specific intent to further those illegal aims.'" Id. at 1022-23 (quoting Claiborne Hardware, 458 U.S. at 920, 102 S.Ct. 3409). Specifically, the Seventh Circuit reasoned that in the § 2333 context, such a showing requires proof "that the defendants knew of [the organization's] illegal activities, that they desired to help those activities succeed, and they engaged in some act of helping the illegal activities." Id. (citation omitted); see also id. at 1024 (stating that it was "irrelevant" if the organization engaged in "legitimate advocacy or humanitarian efforts ... if [defendants] knew about [the organization's] illegal operations, and intended to help [the organization] accomplish those illegal goals when they contributed money to the organization") (citing Claiborne Hardware, Scales and other cases). In the instant case, the district court did nothing to insure that the jury was instructed upon, and the government met, the proper scienter burden as described above.[15]
 
 
 255
 For the foregoing reasons, I believe that § 2339B's "material support" provisions constitute a violation of the Fifth Amendment when applied without the necessary specific intent requirement. Unlike the situation faced in Al-Arian, however, in Hammoud's case it is many days too late to apply a savings instruction—or to preliminarily enjoin the government from applying the "material support" provision as written, as in Humanitarian Law Project III—therefore, I turn to the application and effect of the constitutional error in this case.
 
 III.
 
 256
 As noted above, to obtain relief on his claim, Hammoud must satisfy the plain error standard, showing that (1) an error occurred, (2) the error was plain, i.e., obvious or clear, (3) the error affected substantial rights, and (4) the error seriously affected the fairness, integrity or public reputation of judicial proceedings. Olano, 507 U.S. at 731-34, 113 S.Ct. 1770. For the reasons that follow, I would find that Hammoud satisfies Olano's plain error standard and he should be granted a new trial on the "material support" charge.
 
 A.
 
 257
 As discussed at length above, when § 2339B's "material support" provision is applied without a scienter requirement, as in this case, constitutional error occurs. In Hammoud's case, that error materialized when the jury was instructed that they could convict Hammoud of violating AEDPA's material support provision without instructing them of the necessary scienter requirement. On Count 78, the district court judge instructed the jury that to convict Hammoud under 18 U.S.C. § 2339B, "three essential elements" must be found. (1) "[Hammoud] provided or attempted to provide material support or resources to Hizballah, a designated foreign terrorist organization;" (2) "[Hammoud] was within the United States or subject to the jurisdiction of the United States;" and (3) "[Hammoud] did such act knowingly.... You will recall the definition[ ] I previously gave you for the term[ ]... knowingly." J.A. 3391-92. Regarding "knowingly," the district court had previously charged the jury with the instruction: "The term `knowingly' as used in these instructions to describe the alleged state of mind of the defendant, means that he was conscious and aware of his action, realizing what he was doing or what was happening around him, and did not act because of ignorance, mistake or accident." Id. at 3302.
 
 
 258
 In short, the district court judge gave the jury no instructions regarding a scienter requirement—whether in a manner akin to that employed by the Ninth Circuit or the Middle District of Florida—for AEDPA's "material support provision." While we review an erroneous jury instruction in light of the entire charge, Jones v. United States, 527 U.S. 373, 390-91, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999), the district court in the instant case erred by failing to provide appropriate guidance regarding a specific intent requirement.
 
 B.
 
 259
 In finding that the error was plain, I suggest that despite the fact that Hammoud's trial counsel did not properly serve up the Fifth Amendment claim here at issue, the district court judge was well-aware of the sweeping nature of the "material support" charge and the inherent possibility that it would criminalize conduct without personal guilt. At the charge conference, the government advocated that the court take the Ninth Circuit's approach in Humanitarian Law Project II. Citing that case, the government stated, "[y]ou may find a violation even if the defendant did not intend to aid in the organization's unlawful activities. The whole thing was just sending it to the orphans to [sic] Hizballah." J.A. 3256 (emphasis added). While the prosecutor's statement was clearly tongue-in-cheek, the impact of the "material support" provision as applied had the effect which the prosecutor suggested. Under the district court's instructions, Hammoud could have been convicted for helping assist Hizballah orphans or humanitarian works if the organization had such projects. While the district court declined to enter the quasi-strict liability instruction that the government advocated, the judge told the prosecutor, "[y]ou can argue that. I'm not going to quote anything from the Ninth Circuit until the Fourth Circuit tells me okay." Id. at 3256.
 
 
 260
 Furthermore, the district court implicitly acknowledged the existence of the constitutional infirmities challenged on appeal, yet it chose to proceed with the scienter-less instruction nonetheless. In discussing "material support," the following colloquy took place between the district court judge and the federal prosecutor:
 
 
 261
 THE COURT: Material support. Define. Now question: Is there any evidence or any question about materiality or is anything that goes considered material support.
 
 
 262
 [GOVERNMENT]: Except for medicine or religious materials. I think that's in the—
 
 
 263
 THE COURT: I guess if you get a few bucks, is that material support? Right out of the statute.
 
 
 264
 [HAMMOUD'S COUNSEL]: You can throw bibles at them but not money.
 
 
 265
 THE COURT: Book of stamps and that's material. All right.
 
 
 266
 Id. at 3257-58. Thus, the district court judge instructed the jury without imposing a scienter requirement despite an implicit understanding that the "material support" provision potentially criminalizes a broad sweep of conduct which has no connection to "concededly criminal activity," and the fact that various aspects of the "material support" provisions had already been held to violate the First Amendment. See Humanitarian Law Project II, 205 F.3d at 1137-38 (holding terms "training" and "personnel" in AEDPA's "material support" provision were unconstitutionally vague).
 
 
 267
 In demonstrating the plain nature of AEDPA's constitutional deficient mens rea requirement, perhaps it is best to compare that statute to the Supreme Court's treatment of the Protection of Children Against Sexual Exploitation Act, 18 U.S.C. § 2252, which the Court held was unconstitutional when applied without a scienter requirement in X-Citement Video, 513 U.S. at 68-72, 115 S.Ct. 464. See Al-Arian, 308 F.Supp.2d at 1335 (stating that in X-Citement Video, "the Supreme Court faced almost the same statutory interpretation issues" as those raised by AEDPA's material support provision). In X-Citement Video, the Supreme Court interpreted a statutory provision which criminalized the "knowing" transport, shipment, receipt, distribution or production of a "visual depiction involv[ing] the use of a minor engaging in sexually explicit conduct." 513 U.S. at 68, 115 S.Ct. 464 (citing 18 U.S.C. § 2252) (internal quotation marks omitted). The Supreme Court rejected the Ninth Circuit's interpretation that the "knowing" mens rea element applied only to the relevant verbs, rather than to the facts that minors were involved and the material was sexually explicit. See id. at 68-69, 115 S.Ct. 464.
 
 
 268
 The Court held that the Ninth Circuit's construction led to absurd results under the First Amendment. See id. at 69, 115 S.Ct. 464. For example, "a retail druggist who returns an uninspected roll of developed film to a customer `knowingly distributes' a visual depiction and would be criminally liable if it were later discovered that the visual depiction contained images of children engaged in sexually explicit conduct." Id. In this manner, the Ninth Circuit's absurd construction of the statute in X-Citement Video is closely related to the absurd results, see supra at 130, which necessarily follow from interpreting AEDPA's "material support" provisions without a scienter requirement. Thus, from the reasoning in X-Citement Video, see 513 U.S. at 70-77, 115 S.Ct. 464, it should have been apparent to the district court that to avoid such absurd results in the AEDPA context the jury needed to be instructed that the specific intent requirement had to be applied to each element of the statute. For the end result of applying "knowingly" as did the Ninth Circuit in Humanitarian Law Project III "is to render a substantial portion of Section 2339B unconstitutionally vague." Al-Arian, 308 F.Supp.2d at 1338.
 
 C.
 
 269
 The failure to require the jury to find what should have been the elements of the material support offense affected Hammoud's substantial rights. By not being instructed on a scienter requirement, the jury was not presented an essential element of the "material support" offense, and as the Third Circuit has remarked, "the omission of an essential element of an offense [in a jury instruction] ordinarily constitutes plain error" satisfying Olano. United States v. Haywood, 363 F.3d 200, 207 (3d Cir.2004) (internal quotation marks and citation omitted). The Tenth Circuit has recognized: "A plainly erroneous jury instruction affects a defendant's `substantial rights' if the instruction concerns a principal element of the defense or an element of the crime, thus suggesting that the error affected the outcome of the case." United States v. McSwain, 197 F.3d 472, 481 (10th Cir.1999) (internal quotation marks and citation omitted); see also United States v. Perez, 43 F.3d 1131, 1139 (7th Cir.1994) (holding that erroneous jury instruction, which failed to include a "precise description of the requisite specific intent element," was plain error affecting defendant's substantial rights such that conviction had to be reversed); cf. United States v. Wilkinson, 137 F.3d 214, 228 (4th Cir.1998) (finding third prong of Olano satisfied where district court failed to give the jury a conclusive instruction on element of materiality). Indeed, such practice "is consistent with the Supreme Court's instruction that due process `requires proof beyond a reasonable doubt of every fact necessary to constitute the crime with which [the defendant] is charged.'" Haywood, 363 F.3d at 207 (quoting In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)) (additional quotation marks and citation omitted). Here, the plainly erroneous jury instructions did not require the government to prove that Hammoud's purported "material support" for Hizballah went to further the organization's criminal conduct. As such, the convicted offense falls well short of the "personal guilt" and connection to "concededly criminal activity" which the Fifth Amendment requires. Scales, 367 U.S. at 224-25, 81 S.Ct. 1469.
 
 D.
 
 270
 Turning to Olano's requirement that the error seriously affected the fairness, integrity or public reputation of judicial proceedings, I note that when reviewing an erroneous jury instruction for plain error, "the relevant inquiry ... is whether, in light of the evidence presented at trial, the failure to instruct had a prejudicial impact on the jury's deliberations, so that it produced a miscarriage of justice." Haywood, 363 F.3d at 207. As the Seventh Circuit remarked in Perez, where the defendant carries his Olano burden of showing the erroneous jury instruction affected his or her substantial rights, "the gravity of such an error makes reversal the usual outcome." 43 F.3d at 1139 (citing United States v. Kerley, 838 F.2d 932, 939 (7th Cir.1988)); see also United States v. Duran, 133 F.3d 1324, 1334 (10th Cir.1998) (holding plain error in jury instruction that allowed a conviction "where one important element may not have been found against the defendant by such a standard cannot be overlooked," and remanding for a new trial) (citation omitted). The Seventh Circuit reasoned that when a jury instruction is erroneous because it does not include the requisite specific intent requirement, "the error affects the integrity of the proceeding itself." Perez, 43 F.3d at 1140 (citations omitted).
 
 
 271
 Applying these principles in the instant case, I would find that the error affected the fairness, reputation and integrity of the judicial proceedings, thus we should vacate Hammoud's "material support" conviction and remand for a new trial. Had the district court judge charged the jury with the scienter requirement, it is highly unlikely that the jury could have convicted Hammoud based on the evidence offered at trial. Indeed, at the jury charge conference, the district court judge examined the language of Count 72 of the indictment, which alleged that Hammoud "used his position as a leader ... to foster support and raise funds for violent Hizballah activity," J.A. 482 ¶ 4(a), and stated: "There was no proof he raised funds for violent Hizballah activity. I have a problem leaving that in when you don't have any proof on that. But it's part of the indictment. I can't just take it out." J.A. 3251 (emphasis added). Accordingly, it is clear that the government failed to connect Hammoud to any terrorist activity on the part of Hizballah, rather it merely associated him with Hizballah, a foreign terrorist organization.[16] This is not a case in which "overwhelming and essentially uncontroverted" evidence exists to support the conclusion that Hammoud supported Hizballah's illegal, terrorist activities, Cotton, 535 U.S. at 633, 122 S.Ct. 1781, and in light of the lack of such evidence I would find that Hammoud suffered prejudice.
 
 IV.
 
 272
 For these reasons, I would hold that the jury instruction upon which Hammoud was convicted of providing material support to Hizballah violated his Fifth Amendment rights, and Hammoud satisfied Olano's "plain error" standard, thus entitling him to a new trial. In recommending as much, I do not seek to give comfort to terrorist organizations, or to diminish the reality of clear and present threats posed by such groups. To the contrary, I seek to uphold the Constitution in a manner that does not harken back to a bleaker era of American history when characters were impugned, and individuals indicted, convicted and punished based on little more than suspicion, association and fear, without the "personal guilt" which is the hallmark of our criminal justice system. In applying AEDPA's material support provisions with the requisite scienter requirement, we may help insure that juries are not driven to findings of guilt by mere fear of the unknown, but instead arrive at the just result only after interrogation of the government's case to determine whether criminal intent is present.
 
 
 273
 I respectfully dissent.
 
 
 
 Notes:
 
 
 [1]
 The Ninth Circuit and most other courts citing theHumanitarian Law Project cases use these Roman numeral designations, referring to the original district court case, Humanitarian Law Project v. Reno, 9 F.Supp.2d 1176 (C.D.Cal.1998), as "Humanitarian Law Project I".
 
 
 [2]
 It is interesting to note that during the writing of this dissent, the Ninth Circuit agreed to hearHumanitarian Law Project III en banc and has thus vacated the three-judge panel opinion. See Humanitarian Law Project v. U.S. Dep't of Justice, 382 F.3d 1154, 2004 WL 2021563 (9th Cir. Sept. 8, 2004), 2004 U.S.App. LEXIS 18933.
 
 
 [3]
 Furthermore, the Ninth Circuit has held that it may, in its "discretion, resolve a pure issue of law raised for the first time on appeal... when `injustice might otherwise result.'"Humanitarian Law Project III, 352 F.3d at 394 (quoting Singleton v. Wulff, 428 U.S. 106, 121, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976)).
 
 
 [4]
 "Terrorist activity" is defined in 8 U.S.C. § 1182(a)(3)(B), and "national security" is defined in § 1189(c)(2), although those definitions are not at issue in this case
 
 
 [5]
 InNat'l Council of Resistance of Iran v. Dep't of State, 251 F.3d 192, 208 (D.C.Cir.2001), the D.C. Circuit held that these provisions violated the Fifth Amendment's due process requirement, and thus held that the entities under consideration have a due process right to "notice that the designation is pending." However, the court also crafted an exception in instances where "notification would impinge upon the security and other foreign policy goals of the United States." Id.
 
 
 [6]
 The Patriot Act modified this definition, but that revision is not at issue here
 
 
 [7]
 Indeed, the freedom of association and vagueness arguments necessarily blend with the Fifth Amendment claim regarding the statute's criminalization of conduct without the requisite "personal guilt." In short, the law lacks the sufficient clarity that would allow persons of "ordinary intelligence a reasonable opportunity to know what is prohibited."Grayned v. City of Rockford, 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). However, even if an individual would reasonably understand that all support of a FTO is prohibited, when the statute is applied without a specific intent requirement, a tension arises because the statute criminalizes "support" of a FTO, though the defendant's conduct has no connection to "concededly criminal activity," thus violating the Fifth Amendment.
 
 
 [8]
 It is not necessary to discuss Hammoud's overbreadth challenge in any significant fashion because the overbreadth standard is a exceedingly narrow exception to the normal rule regarding facial challengesSee Virginia v. Hicks, 539 U.S. 113, 118, 123 S.Ct. 2191, 156 L.Ed.2d 148 (2003). As such "[e]ven where a statute at its margins infringes on protected expression, `facial invalidation is inappropriate if the remainder of the statute ... covers a whole range of easily identifiable and constitutionally proscribable ... conduct.'" Osborne v. Ohio, 495 U.S. 103, 112, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990) (quoting New York v. Ferber, 458 U.S. 747, 770 n. 25, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982)). Here, because statutory terms such as "weapons" and "explosives" are clearly not overbroad, this substantiality showing is most difficult to overcome.
 
 
 [9]
 Likewise, I do not discuss in detail the Sixth Amendment argument raised with reference to the Secretary of State's designation provisions, because it lacks merit. In short, while thefact of the Secretary's designation is an element of the offense, the designation's validity is not. Cf. United States v. Bozarov, 974 F.2d 1037, 1045-46 (9th Cir.1992) (because Secretary's licensing designation was not an element of the criminal charge, defendant's inability to challenge designation did not violate due process); United States v. Mandel, 914 F.2d 1215, 1221 (9th Cir.1990) (holding under Export Administration Act, Secretary's decision to control a commodity "does not involve the defendant's individual rights and is not an element of the charged offense").
 In United States v. Sattar, 272 F.Supp.2d 348, 367 (S.D.N.Y.2003), the court applied this reasoning to reject precisely the sort of challenge Hammoud levies, stating "[t]he correctness of the designation itself is not an element of the offense and therefore the defendants' right to due process is not violated by their inability to challenge the factual correctness of that determination." See also Al-Arian, 308 F.Supp.2d at 1344-47 (rejecting the same). But see United States v. Rahmani, 209 F.Supp.2d 1045, 1053-58 (C.D.Cal.2002) (finding individual defendant had standing to challenge an organization's designation and that § 1189 is unconstitutional).
 
 
 [10]
 Indeed, a pure First Amendment freedom of association argument may be somewhat overstated because Hammoud's prosecution did not rely on mere association to the extent at issue in the communist cases; rather, the indictment alleged that he "knowingly provide[d]... material support or resources to Hizballah ... by causing Said Harb to transport $3,500 ... to Sheik Abbas Harake." J.A. 498. Nonetheless, as discussed below, the statute does not avoid the "personal guilt" infirmity
 
 
 [11]
 Relatedly, in defending the statute from First Amendment attack, the government asserts that AEDPA need only satisfy the intermediate scrutiny standard ofUnited States v. O'Brien, 391 U.S. 367, 376-77, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). See Humanitarian Law Project II, 205 F.3d at 1135 (holding that the material support restriction did not warrant strict scrutiny "because it is not aimed at interfering with the expressive component of their conduct but at stopping aid to terrorist groups"). Under O'Brien, the court must determine whether: (1) the regulation is within the government's power; (2) it supports an important or substantial government interest; (3) the regulation is unrelated to the suppression of speech; and (4) the restriction on speech is no greater than necessary. 391 U.S. at 377, 88 S.Ct. 1673. While, assuming arguendo that intermediate scrutiny applies and AEDPA satisfies the first three standards as the regulation is within the war and foreign policy powers, serves an important interest in preventing terrorism, is arguably related to suppressing certain conduct, not speech, the emphasis of our inquiry falls on whether AEDPA is sufficiently well tailored to meet these end goals. I suggest that it is not because the "material support" provision's vast sweep leads to a Fifth Amendment violation. Because I believe such a result follows under O'Brien, I do not examine a strict scrutiny challenge to the statute. I note, however, that the Amici make, at least, a colorable argument that strict scrutiny applies. See Br. of Amici Curiae at 11 n.2 (arguing AEDPA's material support statute "does not impose a content-neutral ban on conduct ... but instead punishes particular support only when done in association with specific disfavored political groups .... The `material support' statute's prohibition on designated groups is analogous to a campaign finance law that restricted contributions only to particular political parties selected by the incumbent government."); see also Al-Arian, 308 F.Supp.2d at 1334-35 (recognizing that level of scrutiny applied would depend on how broadly the court interpreted AEDPA; "[t]he broader this Court interprets [the statute], the more likely that the statute[ ] receive[s] a higher standard of review and [is] unconstitutional").
 
 
 [12]
 Similarly,Amici Curiae properly recognize that the jury was not instructed that it had to find Hammoud intended the donation to be used for any violent, terrorist, or otherwise unlawful purpose, thus setting up the anomalous result that under § 2339B "Hammoud would be guilty even if it were stipulated that his support was intended to further only Hizballah's lawful activities ... [while] an individual who gave a donation to a non-designated group intending that it be used for terrorist activity would not be guilty." Br. of Amici Curiae at 6.
 
 
 [13]
 EvenHumanitarian II seemed to acknowledge that the term "knowingly" did not cure any vagueness problems that existed. See 205 F.3d at 1138 n. 5 ("[T]he term `knowingly' modifies the verb `provides' meaning that the only scienter requirement here is that the accused violator have knowledge of the fact that he has provided something, not knowledge of the fact that what is provided in fact constitutes material support.").
 
 
 [14]
 Additionally, I note that even without the scienter requirement which I advocate, various courts have struck aspects of the "material support" provisions as void for vaguenessSee Humanitarian II, 205 F.3d at 1137 (holding that term "personnel" is void for vagueness as the law is not "sufficiently clear so as to allow persons of `ordinary intelligence' a reasonable opportunity to know what is prohibited") (internal quotation marks omitted) (citing Grayned, 408 U.S. at 108, 92 S.Ct. 2294); id. at 1138 (holding the term "training" is also void for vagueness, and stating "a plaintiff who wishes to instruct members of a designated group on how to petition the United States" for assistance could violate AEDPA); Humanitarian Law Project v. Ashcroft, 309 F.Supp.2d 1185, 1199 (C.D.Cal.2004) (holding "expert advice or assistance" is impermissibly vague); Sattar, 272 F.Supp.2d at 361 (holding "personnel" and provision of "communications equipment" were impermissibly vague); see also Humanitarian III, 352 F.3d at 403 (reiterating Humanitarian II holding that terms "personnel" and "training" were impermissibly vague). But cf. Lindh, 212 F.Supp.2d at 572-73 (holding term "personnel" was not overbroad).
 
 
 [15]
 Finally, theAl-Arian court remarked that the government's scienter burden is not "that great in the typical case." 308 F.Supp.2d at 1339. It suggested that the intent can often be easily inferred by juries, e.g., "a jury could infer a specific intent to further the illegal activities of a FTO when a defendant knowingly provides weapons, explosives, or lethal substances to an organization that he knows is a FTO because of the nature of the support." Id. More germane to the instant case, Al-Arian also suggested that "a jury could infer a specific intent when a defendant knows that the organization continues to commit illegal acts and the defendant provides funds to that organization knowing that money is fungible and, once received, the donee can use the funds for any purpose it chooses." Id.
 
 
 [16]
 It is further worth noting that not only did the government fail to connect Hammoud's purported $3,500 donation to Sheik Abbas Harake to any illegal purpose, or concededly criminal act, but the government could barely connect the funds to Haraketo any degree whatsoever. The government admits that the only source of information indicating that Hammoud was sending money to Hizballah was Said Harb. Harb was described throughout the trial as untrustworthy, manipulative, a liar and an exaggerator. See, e.g., J.A. 1412, 1408, 2215, 2504. With reference to the alleged $3,500 in "material support" provided to Hizballah, Harb testified that he had once carried money to Harake for Hammoud. Id. at 2763. He testified that the money he carried was in an envelope which Hammoud said had two checks totaling $3,500. Id. at 2761-64. Harb testified that he spoke with Harake by telephone while in Lebanon, but never met with him and did not deliver money to him. J.A. 2764-66. Instead, Harb stated he "g[a]ve it [the envelope] to my mom and, you know, told her to make sure it gets to [Hammoud's] mom." Id. at 2765. Ostensibly, under the government's theory, Hammoud's mother gave the money to Harake, although I have found no testimony in the record completing this chain that allegedly stretched from Hammoud to Harake. Indeed, Harb never explained how the money got to Harake, nor did he state that he even spoke with Hammoud's mother to make sure she received the envelope, let alone spoke to Harake to assure that he received the envelope from Hammoud's mother. Despite these facts, the $3,500 transfer was the sole transaction offered by the government in support of Count 78 against Hammoud.